06-0319-cv(L)

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: January 18, 2008          Decided: August 14, 2008)

Docket No. 06-0319-cv(L)

- - - - - - - - - - - - - - - - - - - -x

IN RE TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

- - - - - - - - - - - - - - - - - - - -x

Before:          JACOBS, Chief Judge, CABRANES, Circuit
                 Judge, VITALIANO, District Judge.[*]

Appeal from orders entered in the district court for the Southern District of New York (Casey, J.), dismissing claims against the seven Saudi Arabian defendants-appellees for lack of subject matter jurisdiction and personal jurisdiction. Affirmed.

> JAMES P. KREINDLER, Kreindler &
> Kreindler LLP, New York, NY
> (Mark S. Moller, Justin T.
> Green, Blanca I. Rodriguez,

---

[*] The Honorable Eric N. Vitaliano of the United States District Court for the Eastern District of New York, sitting by designation.

Andrew J. Maloney, III, of counsel, Vincent I. Parrett, on the brief), for the Ashton Plaintiffs-Appellants.

STEPHEN A. COZEN, Cozen O'Connor, Philadelphia, PA (Elliott R. Feldman, Sean P. Carter, of counsel, Stephen B. Burbank, Philadelphia, PA, on the brief), for Plaintiffs-Appellants Federal Insurance Company, Pacific Employers Insurance Company and Vigilant Insurance Company.

ANDREA BIERSTEIN, Hanly Conroy Bierstein Sheridan Fisher & Hayes LLP, New York, NY (Ronald L. Motley, Jodi W. Flowers, Michael Elsner, Justin B. Kaplan, Motley Rice LLC, Mt. Pleasant, SC, of counsel, Paul Hanly, Jr., Jayne Conroy, Hanly Conroy Bierstein Sheridan Fisher & Hayes LLP, on the brief), for the Burnett and World Trade Center Properties and Euro Brokers Plaintiffs-Appellants.

ROBERT M. KAPLAN, Ferber Chan Essner & Coller, LLP, New York, NY, for Plaintiffs-Appellants Continental Casualty Company, Transcontinental Insurance Company, Transportation Insurance Company, Valley Forge Insurance Company, National Fire Insurance Company of Hartford and American Casualty Company of Reading, Pennsylvania.

JERRY S. GOLDMAN, Law Offices of Jerry S. Goldman & Associates,

P.C., New York, NY, Frederick J. Salek, <u>on the brief</u>), <u>for the O'Neill Plaintiffs-Appellants</u>.

DAVID H. FROMM, Brown Gavalas & Fromm LLP, New York, NY (Frank J. Rubino, <u>on the brief</u>), <u>for Plaintiff-Appellant New York Marine and General Insurance Company</u>.

KENNETH L. ADAMS, Dickstein Shapiro LLP, Washington, DC (Christopher T. Leonardo, <u>on the brief</u>), for <u>Plaintiffs-Appellants Cantor Fitzgerald & Co. and Port Authority of New York and New Jersey</u>.

MICHAEL K. KELLOGG, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC (Mark C. Hansen, Colin S. Stretch, Kelly P. Dunbar, <u>on the brief</u>), <u>for Defendants-Appellees the Kingdom of Saudi Arabia and His Royal Highness Prince Turki al-Faisal bin Abdulaziz al-Saud</u>.

LAWRENCE S. ROBBINS, Robbins, Russell, Englert, Orseck & Untereiner LLP, Washington, DC (Roy T. Englert, Jr., Alison C. Barnes, Rachel S. Li Wai Suen, <u>on the brief</u>), <u>for Defendant-Appellee the Saudi High Commission</u>.

WILLIAM H. JEFFRESS, JR., Baker Botts LLP, Washington, DC (Jeffrey A. Lamken, Christopher R. Cooper, Sara E. Kropf, Jamie S. Kilberg, Allyson N. Ho, <u>on the brief</u>), <u>for Defendants-</u>

3

Appellees His Royal Highness Prince Salman bin Abdulaziz al-Saud, His Royal Highness Crown Prince Sultan bin Abdulaziz al-Saud, His Royal Highness Prince Naif bin Abdulaziz al-Saud.

LOUIS R. COHEN, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC (Shirley C. Woodward, Tracey C. Allen, Douglas F. Curtis, David Bowker, on the brief), for Defendant-Appellee His Royal Highness Prince Mohamed al Faisal al Saud.

DENNIS JACOBS, Chief Judge:

The plaintiffs-appellants are persons who incurred losses in the September 11, 2001 terrorist attacks: those who suffered personal injuries, the families and representatives of those who died, insurers and property owners. They have brought tort claims against hundreds of parties: foreign governments, charitable entities, and individuals alleged to have provided financial and logistical support to al Qaeda in the runup to the attacks. Plaintiffs take this appeal from a partial final judgment entered on January 10, 2006 in the United States District Court for the Southern District of New York (Casey, J.), dismissing their claims against twelve of the numerous defendants. They have appealed that judgment with respect

4

to seven of the dismissed defendants: the Kingdom of Saudi Arabia ("the Kingdom"), four Saudi princes ("Four Princes"), a Saudi banker ("Mohamed"), and the Saudi High Commission for Relief to Bosnia and Herzegovina ("SHC").  We have jurisdiction over their appeals pursuant to 28 U.S.C. § 1291.

The chief issue on appeal is the scope of foreign sovereign immunity.  The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602-1611 ("FSIA"), grants foreign sovereigns immunity from suit in the United States subject to enumerated exceptions.  We conclude that the FSIA protects the appellees--most obviously, the Kingdom itself. First, we hold that the FSIA applies to individual officials of foreign governments in their official capacities, and therefore to the Four Princes.  Second, we affirm the district court's conclusion that the SHC is an "agency or instrumentality" of the Kingdom, to which the FSIA likewise applies.

Further, we conclude that none of the FSIA's exceptions applies.  The plaintiffs' claims do not come within the statutory exception for state-sponsored terrorist acts, 28 U.S.C. § 1605A ("Terrorism Exception"), because the Kingdom

has not been designated a state sponsor of terrorism by the United States.  As to the exception for personal injury or death caused by a foreign sovereign's tortious act, id. § 1605 (a)(5) ("Torts Exception"), we decline to characterize plaintiffs' claims--expressly predicated on a state-sponsored terrorist act--as sounding in tort.  Nor do the plaintiffs' claims come within the statutory exception for a foreign sovereign's commercial activity, id. § 1605(a)(2) ("Commercial Activities Exception"), because the defendants' specific alleged conduct--supporting Muslim charities that promote and underwrite terrorism--is not conduct in trade, traffic or commerce.

Accordingly, we agree with the district court that it lacked subject matter jurisdiction over the claims against the Kingdom, the Four Princes in their official capacities, and the SHC.  We likewise affirm the district court's dismissal of the claims against the Four Princes (in their personal capacities) and Mohamed for want of personal jurisdiction, and the denial of the plaintiffs' motions for jurisdictional discovery.

**BACKGROUND**

The complaints vary somewhat in their details, but they share a core allegation: the defendants played a critical role in the September 11 attacks by funding Muslim charities that, in turn, funded al Qaeda. Since "there would not be a trigger to pull or a bomb to blow up without the resources to acquire such tools of terrorism and to bankroll the persons who actually commit the violence," Boim v. Quranic Literacy Inst., 291 F.3d 1000, 1021 (7th Cir. 2002), plaintiffs argue that the defendants should be held liable for the consequences of their material support for al Qaeda. The complaints, which we accept as true at the pleading stage, Garb v. Republic of Poland, 440 F.3d 579, 581 (2d Cir. 2006), allege the facts set forth below.

The SHC[2]

The SHC was formed in 1993 by decree of King Fahd (who was then President of the Council of Ministers, the Kingdom's highest governing body), apparently to support

---

[2] The SHC was named as a defendant in the complaints filed by Federal Insurance, Burnett, Ashton, Cantor, New York Marine and General Insurance Company, World Trade Center Properties and Euro Brokers.

7

Bosnian Muslims displaced by civil war. The SHC acted as "a fully integrated component of al Qa[e]da's logistical and financial support infrastructure." In the early 1990s, al Qaeda fighters began infiltrating Bosnia disguised as SHC relief workers. The SHC has funneled millions of dollars to al Qaeda, evidenced by investigators' inability "to account for nearly $41 million" in SHC donations. In an October 2001 raid of the SHC's Sarajevo offices, U.S. government officials found computer hard drives containing photos of the World Trade Center, the U.S. embassies in Kenya and Tanzania, and the U.S.S. Cole (all targets of terrorist attacks); documents about pesticides and crop dusters; photos and maps of Washington, D.C. (with prominent government buildings marked); and instructions for fabricating U.S. State Department badges. After the raid, the Bosnian Financial Police reported that peacekeeping forces "confiscated some documentation for which it can be claimed with certainty that it does not belong in the scope of work of a humanitarian organization."

Similar allegations have been lodged against numerous other Muslim charities. Although those claims are not raised in this appeal, the allegations about the charities

8

provide the necessary background for the issues here.  The summary allegation is as follows:

> Ostensible charitable organizations, and in particular, Islamic charities under the control of the Kingdom of Saudi Arabia, have played a singularly important role in al Qa[e]da's development and pursuit of its perverse ambitions.  These "charities" have served as the primary vehicle for raising, laundering and distributing funds on behalf of al Qa[e]da from its inception.  In addition, these charities have provided arms, false travel documentation, physical assets and logistical support to al Qa[e]da.

These allegations include a wealth of detail (conscientiously cited to published and unpublished sources) that, if true, reflect close working arrangements between ostensible charities and terrorist networks, including al Qaeda.  The United States government has listed several of the charities (or their branch offices) as "Specifically Designated Global Terrorists," and has taken steps to shut down their operations.

### The Kingdom of Saudi Arabia[3]

The Kingdom contributed to the terrorist-linked

---

[3] The Kingdom is named as a defendant in the complaints filed by Federal Insurance, Vigilant, Cantor, New York Marine, O'Neill and Pacific Employers.

charities described above and closely monitored their relief efforts abroad, with the express knowledge that those charities were funneling the Kingdom's funds to al Qaeda. According to the Federal Insurance Plaintiffs, the Kingdom exercises complete oversight and control over the charities, making the charities alter-egos and agents whose deeds can be imputed to the Kingdom.

The Four Princes[4]

The Four Princes are: His Royal Highness Prince Salman bin Abdulaziz al-Saud ("Prince Salman"), His Royal Highness Crown Prince Sultan bin Abdulaziz al-Saud ("Prince Sultan"), His Royal Highness Prince Naif bin Abdulaziz al-Saud ("Prince Naif"), and His Royal Highness Prince Turki al-Faisal bin Abdulaziz al-Saud ("Prince Turki"). Broadly stated, it is alleged that they caused money to be given to the Muslim charities (from the Kingdom as well as their own accounts), with the knowledge that the charities would

---

[4] Princes Sultan and Turki are named as defendants in the complaints filed by Ashton, Burnett, Cantor, Continental Casualty, Euro Brokers, Federal Insurance, New York Marine and World Trade Center Properties. Princes Salman and Naif are named as defendants in the Ashton, Burnett, Cantor and Federal complaints.

transfer the funds to al Qaeda.

Princes Naif, Sultan and Turki sit on the Kingdom's Supreme Council of Islamic Affairs, which monitors and approves Islamic charitable giving both within and outside the Kingdom. (The Kingdom generally requires Saudis to obtain government approval for private charitable giving abroad.)

Prince Salman is President of the SHC and Governor of Riyadh Province. He intended that the SHC would be a conduit for funding and supporting the Bosnian Islamic movement, including al Qaeda. Prince Salman was put on notice of SHC's connection with al Qaeda by a letter he received in 2000 from a group called the "Mothers of Srebrenica" complaining that the SHC's money was not being used for humanitarian aid in Bosnia.

Prince Sultan is Chairman of the Supreme Council and First Deputy President of the Council of Ministers. He has been designated as the successor to King Abdullah. Sultan received at least three warnings that the Muslim charities were al Qaeda fronts.[5] Prince Sultan also made personal

---

[5][1] At a November 1994 meeting with Princes Sultan and Naif, French Interior Minister Charles Pasqua "raised the question of financial aid furnished by Saudi charitable

contributions to the charities.  According to a 1996 report in a Muslim newspaper, he donated one million Saudi dollars to one of the charities pursuant to an annual pledge. Sultan also made a sizable contribution to the Saudi Joint Relief Committee of Kosovar Refugees ("SJRC"), which oversees several other Muslim charities.

Prince Naif is Saudi Minister of the Interior, in which capacity he monitors and controls the charities that operate in Saudi Arabia.  At one time, Naif served as the General Supervisor of the SJRC.  Prince Naif was present with Prince Sultan when he was warned that Saudi charities serve as fronts for terrorist groups.  Naif has personally contributed more than two million Saudi dollars to the SJRC, and has helped the SJRC raise money from other wealthy Saudis.

---

organizations enjoying state support, in particular the World Islamic League, to Islamist movements or terrorist groups . . . insofar as the Islamist groups receiving this aid were likely to damage French interests or had already done so in the past"; [2] at a 1999 meeting between U.S. representatives and the "Finance Ministry, intelligence, and law enforcement officials in Saudi Arabia," the United States put Saudi Arabia and the United Arab Emirates on notice of its intent to apply "pressure to deal effectively with those who fund terrorism," and soon thereafter, Sultan visited the White House to discuss terrorism issues; and [3] in 1997, Sultan joined an anti-terrorism initiative with the United States.

Prince Turki was the director of the Kingdom's Department of General Intelligence ("DGI") until August 2001. In the 1980s, Turki met Osama bin Laden at the Saudi embassy in Islamabad, Pakistan; he later met with bin Laden at least five times in the 1980s and 1990s. In 1998, Turki agreed with the Taliban and al Qaeda that the Kingdom would not attempt to extradite bin Laden or his followers, in return for bin Laden's agreement not to target the Kingdom or its royal family. During Turki's tenure, there existed "near identity" between DGI and the Taliban. The Federal Plaintiffs allege in addition that Turki donated to the charities in his personal capacity.

Prince Mohamed[6]

The plaintiffs' claims against Mohamed, His Royal Highness Prince Mohamed al Faisal al Saud, focus on his role in Islamic banking.[7] Osama bin Laden and other terrorists held accounts at banks (and subsidiaries of banks) managed

---

[6] Prince Mohamed is named as a defendant in the complaints filed by Ashton, Burnett, Cantor, Continental Casualty, Euro Brokers, Federal Insurance, New York Marine, O'Neill and World Trade Center Properties.

[7] Unlike the Four Princes, Prince Mohamed is not a government official of the Kingdom.

13

by Mohamed; those banks are governed by Islamic law, or sharia, which prohibits interest; instead, the banks and their depositors manage the funds jointly.  It is alleged that Mohamed knowingly provided material sponsorship to international terrorism.

Procedural History

The Burnett Plaintiffs filed suit against Princes Sultan and Turki (and other defendants not present in this appeal) in the United States District Court for the District of Columbia.  The district court (Robertson, J.), dismissed the claims brought against Princes Sultan and Turki in their official capacities for lack of subject matter jurisdiction, and the claims against Prince Sultan in his personal capacity for lack of personal jurisdiction.  Burnett v. Al Baraka Inv. & Dev. Corp., 292 F. Supp. 2d 9 (D.D.C. 2003).

On December 9, 2003, the Judicial Panel on Multi-district Litigation transferred Burnett to the United States District Court for the Southern District of New York as MDL 1570 to be consolidated for pretrial purposes with other similar cases.  The consolidated proceeding was assigned to the late Judge Richard Conway Casey.

14

On January 18, 2005, Judge Casey dismissed the consolidated claims against the Kingdom, Princes Sultan and Turki, and Mohamed. In re Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765 (S.D.N.Y. 2005) ("In re Terrorist Attacks I"). Citing the majority view among the circuits, Judge Casey concluded that the FSIA shields Princes Sultan and Turki in their official capacities. (The plaintiffs do not dispute that the FSIA protects the Kingdom as a foreign sovereign.) Judge Casey further held that no exception to the FSIA defeated the defendants' sovereign immunity.

Judge Casey likewise dismissed the claims against Princes Sultan and Turki (in their personal capacities) and against Mohamed for lack of personal jurisdiction. Judge Casey reasoned that the plaintiffs had failed to "offer any facts to lend support to their allegation that Prince Sultan purposefully directed his activities at this forum by donating to charities that he knew at the time supported international terrorism." In re Terrorist Attacks I, 349 F. Supp. 2d at 813. Similarly, the Federal Plaintiffs failed to present "any specific facts from which this Court could infer Prince Turki's primary and personal involvement in, or support of, international terrorism and al Qaeda.

Conclusory allegations that he donated money to charities, without specific factual allegations that he knew they were funneling money to terrorists, do not suffice." Id. at 813-14. Finally, there was no allegation "that Prince Mohamed had any knowledge or involvement in any al Qaeda accounts at any of the banks he chaired"; and his connection to the Sudanese bank "which purportedly knowingly opened accounts for al Qaeda operatives, including Osama bin Laden, is too remote in time and proximity to implicate" him. Id. at 816.

On May 5, 2005, the district court entered an order dismissing the claims against the Kingdom, Princes Sultan and Turki, and Mohamed in the remaining consolidated cases. (The plaintiffs conceded that the allegations and evidence in the other consolidated cases against those four defendants did not materially differ from the allegations in the cases already dismissed.)

In an opinion and order issued on September 21, 2005, the district court dismissed the Ashton, Burnett and Federal Plaintiffs' claims against Princes Salman and Naif and the SHC on substantially the same grounds. The court concluded that the SHC is an agency of the Kingdom entitled to immunity under the FSIA, and that subject matter

16

jurisdiction was therefore lacking over the claims against the SHC and Princes Salman and Naif (in their official capacities).  The claims against Princes Salman and Naif in their personal capacity were dismissed for lack of personal jurisdiction.  In re Terrorist Attacks on Sept. 11, 2001, 392 F. Supp. 2d 539 (S.D.N.Y. 2005) ("In re Terrorist Attacks II").

On December 16, 2005, the district court certified as "final" the orders of January 18, 2005 and September 21, 2005, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, with respect to the Kingdom; Princes Sultan, Turki, Salman and Naif; Mohamed and the SHC.[8]  By virtue of the December 16, 2005 certification, this Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

**DISCUSSION**

"The standard of review applicable to district court decisions regarding subject matter jurisdiction under the FSIA is clear error for factual findings and de novo for legal conclusions."  Robinson v. Gov't of Malaysia,

---

[8] Per stipulation, the plaintiffs with claims pending against Princes Salman and Naif will be bound by any appellate decision on the district court's dismissals.

17

269 F.3d 133, 138 (2d Cir. 2001) (quoting U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., 241 F.3d 135, 150-51 (2d Cir. 2001) (internal quotation marks omitted)). The same standards apply to decisions on personal jurisdiction. Sunward Electronics, Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004). We review a district court's decision to deny jurisdictional discovery for abuse of discretion. Best Van Lines, Inc. v. Walker, 490 F.3d 239, 255 (2d Cir. 2007).

                                I

"[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989). See also Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 493 (1983) (stating that the FSIA "must be applied by the District Courts in every action against a foreign sovereign, since subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity" (citing 28 U.S.C. § 1330(a)); Cabiri v. Gov't of Republic of Ghana, 165 F.3d 193, 196 (2d Cir. 1999) ("The FSIA is the sole source for subject matter jurisdiction over

18

any action against a foreign state."). "Under the Act, a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993); 28 U.S.C. § 1604 (making foreign states "immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter"). Potentially relevant here are the exceptions for torts, terrorism, and commercial activities. 28 U.S.C. §§ 1605(a)(5), 1605A, 1605(a)(2).

"Under the FSIA, . . . personal jurisdiction equals subject matter jurisdiction plus valid service of process." Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1020 (2d Cir. 1991). See 28 U.S.C. § 1330(b) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title."). Of course, "the Act cannot create personal jurisdiction where the Constitution forbids it. Accordingly, each finding of personal jurisdiction under the

19

FSIA requires, in addition, a due process scrutiny of the court's power to exercise its authority over a particular defendant." Texas Trading & Milling Corp. v. Fed. Republic of Nigeria, 647 F.2d 300, 308 (2d Cir. 1981).

In a motion to dismiss for lack of subject matter jurisdiction under the FSIA, the defendant must present a "prima facie case that it is a foreign sovereign." Virtual Countries, Inc. v. Republic of South Africa, 300 F.3d 230, 241 (2d Cir. 2002) (internal quotation marks omitted). The plaintiff then "has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." Cargill Intern. S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1016 (2d Cir. 1993). "Determining whether this burden is met involves a review [of] the allegations in the complaint, the undisputed facts, if any, placed before [the court] by the parties, and--if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue--[resolution of] disputed issues of fact.'" Virtual Countries, 300 F.3d at 241 (quoting Robinson, 269 F.3d at 141 (alterations in original and internal quotation marks omitted)). The "ultimate burden of persuasion remains with the alleged

20

foreign sovereign." Cargill, 991 F.2d at 1016 (quoting Robinson, 269 F.3d at 141 (internal quotation marks omitted)).

**II**

This Circuit has not yet decided whether the FSIA protects an individual official of a foreign government acting in his official capacity. See Kensington Intern. Ltd. v. Itoua, 505 F.3d 147, 160, 161 (2d Cir. 2007) (acknowledging that "it is an open question in this circuit whether individual officials enjoy sovereign immunity under the FSIA," and remanding for the district court "to address in the first instance . . . under what circumstances, if any, the FSIA applies to individuals"); Tachiona v. United States, 386 F.3d 205, 220 (2d Cir. 2004) (expressing in dicta "some doubt as to whether the FSIA was meant to supplant the 'common law' of head-of-state immunity, which generally entailed deference to the executive branch's suggestions of immunity"); In re Doe, 860 F.2d 40, 45 (2d Cir. 1988) ("Because the FSIA makes no mention of heads-of-state, their legal status remains uncertain.").

**A**

We join our sister circuits in holding that an individual official of a foreign state acting in his official capacity is the "agency or instrumentality" of the state, and is thereby protected by the FSIA. See Velasco v. Gov't of Indonesia, 370 F.3d 392, 399 (4th Cir. 2004) ("Claims against the individual in his official capacity are the practical equivalent of claims against the foreign state."); Keller v. Cent. Bank of Nigeria, 277 F.3d 811, 815 (6th Cir. 2002) ("[N]ormally foreign sovereign immunity extends to individuals acting in their official capacities as officers of corporations considered foreign sovereigns."); Byrd v. Corporacion Forestal y Industrial de Olancho S.A., 182 F.3d 380, 388 (5th Cir. 1999) (same); Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1027 (D.C. Cir. 1997) ("Individuals acting in their official capacities are considered 'agenc[ies] or instrumentalit[ies] of a foreign state;' these same individuals, however, are not entitled to immunity under the FSIA for acts that are not committed in an official capacity."); Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095, 1101-03 (9th Cir. 1990) ("We thus join the majority of

courts which have similarly concluded that section 1603(b) can fairly be read to include individuals sued in their official capacity."). Several district judges in this Circuit have reached the same conclusion. See, e.g., Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah, 184 F. Supp. 2d 277, 286-87 (S.D.N.Y. 2001) (Lynch, J.); Tannenbaum v. Rabin, 1996 WL 75283, at *2 (E.D.N.Y. Feb. 13, 1996) (Glasser, J.); Bryks v. Canadian Broad. Corp., 906 F. Supp. 204, 210 (S.D.N.Y. 1995) (Mukasey, J.); Kline v. Kaneko, 685 F. Supp. 386, 389 n.1 (S.D.N.Y. 1988) (Ward, J.).

The Seventh Circuit is an outlier. It has construed the FSIA's grant of immunity narrowly, to exclude individual government officials, reasoning that "[i]f Congress meant to include individuals acting in the official capacity in the scope of the FSIA, it would have done so in clear and unmistakable terms." Enahoro v. Abubakar, 408 F.3d 877, 881-82 (7th Cir. 2005).

**B**

"[F]oreign sovereign immunity is a matter of grace and comity on the part of the United States, and not a

23

restriction imposed by the Constitution." Verlinden, 461 U.S. at 486.  Until the 1950s, the judiciary "consistently . . . deferred to the decisions of the political branches--in particular, those of the Executive Branch--on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." Id.  In 1952, the State Department issued the "Tate Letter,"[9] which "announced [the] adoption of the 'restrictive' theory of foreign sovereign immunity.  Under this theory, immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts." Id. at 487.  The Ninth Circuit described the scheme of the Tate Letter as follows:

> Typically, a foreign state or instrumentality faced with a suit in a court in our country would apply to the State Department for a finding of immunity.  The State Department would make a determination, considering the common law principles expressed in the Restatement, and would convey the finding to the relevant court by filing a "suggestion." In fact, however, the courts treated such "suggestions" as binding determinations, and would invoke or deny immunity based upon the decision of the State Department.

Chuidian, 912 F.2d at 1100.  But by the 1970s, some in

---

[9] Jack B. Tate was then Acting Legal Adviser of the Department of State.

24

Congress had grown concerned that the Tate Letter system was "leaving immunity decisions subject to diplomatic pressures rather than to the rule of law." Id.

The FSIA, enacted in 1976, "largely codif[ied] the existing common law of sovereign immunity," with the notable exception that it "remove[d] the role of the State Department in determining immunity." Id.; see also H.R. Rep. No. 94-1487, at 7 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6605 ("House Report") ("[T]he bill would codify the so-called 'restrictive' principle of sovereign immunity, as presently recognized in international law. Under this principle, the immunity of a foreign state is 'restricted' to suits involving a foreign state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis).").

Recognizing "the potential sensitivity of actions against foreign states," the FSIA "aimed to facilitate and depoliticize litigation against foreign states and to minimize irritations in foreign relations arising out of such litigation." Cargill, 991 F.2d at 1016 (internal citation and quotation marks omitted).

The FSIA defines "foreign state" as follows:

25

(a) "foreign state" . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity--

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(a), (b).

# C

Several plaintiffs read "state," as used in the FSIA, as a term of art meaning "an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities." Restatement (Third) of Foreign Relations Law § 201 (1987). This definition necessarily excludes individual government

officials.  Nor, argue these plaintiffs, can an official be considered an "agency or instrumentality" of a state, because the entities listed in the subclauses of § 1603(b) are "defined in terms not usually used to describe natural persons."  Tachiona, 386 F.3d at 221.  Writing as amicus curiae in another FSIA lawsuit, the Department of Justice has opined that the FSIA, with its exclusions and obscurities, stops short of shielding government officials, who instead enjoy an expansive common law immunity.[10]  Because we decide this case on the ground that the FSIA protects individual government representatives in their official capacities, we need not consider any continuing vitality of sovereign immunity under the common law.

The Ninth Circuit's opinion in Chuidian is the most detailed statement of the majority view that an individual official is an "agency or instrumentality" of a foreign government.  As Chuidian observes, the "terms 'agency,' 'instrumentality,' 'organ,' "entity,' and 'legal person,' while perhaps more readily connoting an organization or

---

[10] In a letter filed pursuant to Fed. R. App. P. 28(j), the Four Princes submitted the amicus brief of the Department of Justice from Kensington Intern. Ltd. v. Itoua, 505 F.3d 147, 160 (2d Cir. 2007).

collective, do not in their typical legal usage necessarily exclude individuals." Chuidian, 912 F.2d at 1101. Moreover, the FSIA's "legislative history does not even hint of an intent to exclude individual officials," but does contain "numerous statements [suggesting] that Congress intended the Act to codify the existing common law principles of sovereign immunity." Id. Prior to the FSIA's passage, those principles "expressly extended immunity to individual officials acting in their official capacity." Id.; see also Restatement (Second) of Foreign Relations Law § 66(f) (1965) ("The immunity of a foreign state . . . extends to . . . any other public minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state."). As a consequence, if the FSIA did not extend to individuals, it would represent "a substantial unannounced departure from prior common law." Chuidian, 912 F.2d at 1101. This is so because, after the FSIA's passage, the Restatement (Third) of Foreign Relations Law "delete[d] in its entirety the discussion of the United States common law of sovereign immunity, and substitute[d] a section analyzing issues

28

exclusively under the [FSIA]." Id. at 1103. Insofar as this revision marks the recognition that we now look to the FSIA where we once sought guidance from the common law, we would expect a departure from the prior common-law rule to be made explicitly, not sub silentio.

The Ninth Circuit rejected the view, advanced by the Department of Justice, that the foreign state is protected by the FSIA while its officials are otherwise protected by common law immunity. Under that approach, "presumably . . . [courts] would once again be required to give conclusive weight to the State Department's determination of whether an individual's activities fall within the traditional exceptions to sovereign immunity," which would run "counter to Congress's stated intent of removing the discretionary role of the State Department." Id. at 1102.

We join the majority of Circuits in holding that the FSIA grants immunity to individual officials of a foreign government for their official-capacity acts, and we subscribe to the reasoning of Chuidian.

That analysis, largely based on legislative history, is grounded in the statutory wording. The term "agency" has a more abstract common meaning than a governmental bureau or

29

office: an agency is any thing or person through which action is accomplished. We need not decide how broadly to construe this word in other contexts; however, it is easily open enough to include senior members of a foreign state's government and secretariat.

This reading of "agency" is consistent with the evident principle that the state cannot act except through individuals. Thus, the act-of-state doctrine precludes our courts from sitting in judgment "on the acts of the government of another done within its own territory," including acts committed by individual officials of foreign governments. Bigio v. Coca-Cola Co., 239 F.3d 440, 451 (2d Cir. 2000) (quoting Underhill v. Hernandez, 168 U.S. 250, 252 (1897)). This is so because "the acts of the official representatives of the state are those of the state itself, when exercised within the scope of their delegated powers." Underhill v. Hernandez, 65 F. 577, 579 (2d Cir. 1895), aff'd 168 U.S. 250 (1897); see also Oetjen v. Cent. Leather Co., 246 U.S. 297, 303 (1918) (concluding that the action of a "duly commissioned military commander" of the Mexican government "[p]lainly . . . was the action, in Mexico, of the legitimate Mexican government when dealing with a

30

Mexican citizen").  Similarly, "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978).  In other words, a claim against an agency of state power, including a state officer acting in his official capacity, can be in effect a claim against the state.  In other contexts as well, the law recognizes that the immunity of a principal does not amount to much without the extension of that immunity to its agents.  See, e.g., Gravel v. United States, 408 U.S. 606, 616-17 (1972) (treating as one a Senator and his aides for purpose of legislative immunity; "if they are not so recognized, the central role of the Speech or Debate Clause--to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary--will inevitably be diminished and frustrated" (internal citation omitted)); Oliva v. Heller, 839 F.2d 37, 40 (2d Cir. 1988) (reasoning that because "law clerks are simply extensions of the judges at whose pleasure they serve . . . for purposes of absolute judicial immunity, judges and their law clerks are as one" (internal citation and quotation marks omitted)).

This conclusion finds reinforcement in the new iteration of the Terrorism Exception, which makes specific reference to the legal status of "an official, employee or agent" of the foreign state. See 28 U.S.C. § 1605A(a)(1) (lifting immunity in connection with, inter alia, the "provision of material support or resources . . . by an official, employee, or agent of [a] foreign state while acting within the scope of his or her office, employment, or agency"); id. at (c) (creating private right of action against a "foreign state that is or was a state sponsor of terrorism . . . , and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency"). These provisions evince congressional recognition that claims against individual officials of a foreign government must be brought within the confines of the FSIA. Individuals and government officers, as non-state entities, cannot be designated "state sponsor[s] of terrorism." So that such individuals would nevertheless fall within the scope of the Terrorism Exception to FSIA immunity, Congress enacted specific provisions that defined the exception to reach these individuals. If these individuals were not otherwise immune

from suit pursuant to the FSIA, these provisions would be entirely superfluous.  We can thus infer that Congress considered individuals and government officers to be within the scope of the FSIA.  Although "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," the Terrorism Exception suggests that Congress has long contemplated the FSIA's application to individuals.  United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 348-49 (1963).  In light of those considerations, we hold that the FSIA treats individual agents of the foreign state, when they undertake their official duties, as the "foreign state" for the purposes of 28 U.S.C. § 1603.

**III**

The Burnett Plaintiffs challenge the district court's conclusion that the SHC is an "agency or instrumentality" of the Kingdom and therefore entitled to immunity under the FSIA.  28 U.S.C. § 1603(a).

To recap, an "agency or instrumentality of a foreign state" is any entity

> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an organ of a foreign state or

33

political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

The question is whether the SHC is an "organ" of the Kingdom. 28 U.S.C. § 1603(b)(2). There is no definition of that word in the FSIA; however, criteria can be found:

(1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.

Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir. 2004) (quoting Kelly v. Syria Shell Petroleum Dev. B.V., 213 F.3d 841, 846-47 (5th Cir. 2000)). See also USX Corp. v. Adriatic Ins. Co., 345 F.3d 190, 209 (3d Cir. 2003) (considering the five Filler factors, along with "the level of government financial support" and "the ownership structure of the entity"). We agree that "Filler invites district courts to engage in a balancing process, without

34

particular emphasis on any given factor and without requiring that every factor weigh in favor of, or against, the entity claiming FSIA immunity." Murphy v. Korea Asset Mgmt. Corp., 421 F. Supp. 2d 627, 641 (S.D.N.Y. 2005) (Holwell, J.).

To support its status as an organ of the Kingdom, the SHC submitted declarations from Saud bin Mohammad Al-Roshood, Director of the Executive Office of SHC, and Dr. Mutlib bin Abdullah Al-Nafissa, a member of the Council of Ministers authorized to speak on the SHC's behalf.

Al-Roshood explains that, during and after the civil war in Bosnia,

> there was much interest within the Kingdom of Saudi Arabia, both among citizens and the government, in supporting charitable projects in Bosnia-Herzegovina. The Kingdom of Saudi Arabia desired to "speak with one voice" as a nation . . . The [SHC] was therefore formed to centralize all charitable giving from the Kingdom to Bosnia-Herzegovina. When formed, the [SHC] was vested with the sole authority to collect and distribute charitable funds in Bosnia.

Al-Roshood states that many SHC employees are seconded from the Kingdom's ministries or agencies, which continues paying their salaries. Other employees are on contract with the SHC, and are paid by the SHC.

35

Al-Nafissa explains that the Council of Ministers created the SHC in 1993, pursuant to its authority (under Council law) "to order the formation of a governmental entity." The same order appointed Prince Salman as SHC's president. Al-Nafissa avers that "a government commission, such as the [SHC], always is chaired or presided over by a governmental official and conducts its affairs in accordance with the domestic or foreign policy objectives of the Kingdom," and "can be sued for [its] administrative acts in the Board of Grievances, the administrative court of Saudi Arabia."

Based on this undisputed record, the Filler factors indicate that the SHC is an organ of the Kingdom. The SHC was created for a national purpose (channeling humanitarian aid to Bosnian Muslims); the Kingdom actively supervises it; many SHC workers are Kingdom employees who remain on the Kingdom's payroll; the SHC holds the "sole authority" to collect and distribute charity to Bosnia; and it can be sued in administrative court in the Kingdom.

The Burnett Plaintiffs note the paucity of information about the SHC's ownership structure (a factor identified by the Third Circuit in USX Corp), and argue that the district

36

court gave this insufficient weight.  We do not see the relevance of this factor here:  The SHC is a non-corporate governmental entity that, like numerous agencies within our own government, has no owners or shareholders.

Nor are we persuaded that the SHC waived its immunity by identifying itself as "nongovernmental" on a registration document filed with Bosnian authorities.  "We and other courts have observed that 'the implied waiver provision of Section 1605(a)(1) must be construed narrowly.'"  Smith v. Socialist People's Libyan Arab Jamahiriya, 101 F.3d 239, 243 (2d Cir. 1996) (quoting Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1017 (2d Cir. 1991)).  See also Cabiri, 165 F.3d at 202 (declining to find waiver where defendant had "taken no action that can be understood to demonstrate either an objective or a subjective intent to waive immunity with respect to [plaintiffs'] claims"); Frolova v. Union of Soviet Socialist Republics, 761 F.2d 370, 378 (7th Cir. 1985) (explaining that "waiver would not be found absent a conscious decision to take part in the litigation and a failure to raise sovereign immunity despite the opportunity to do so").  Registering as a humanitarian organization in Bosnia does not reflect a conscious decision by the SHC to

waive its sovereign immunity in American courts.  The SHC's outside legal counsel in Bosnia avers that the term "nongovernmental" on the registration documents refers to whether the humanitarian organization is part of the government of Bosnia, and that "[t]here is no prohibition against humanitarian organizations that are part of foreign governments operating in Bosnia-Herzegovina."

**IV**

We next consider the plaintiffs' arguments about the applicability of two exceptions to the FSIA: the Torts Exception and the Commercial Activities Exception.[11]

The FSIA lifts immunity for certain torts committed by foreign sovereigns:

---

[11] Because we conclude that no exception lifts the FSIA's protection of the Kingdom and the SHC, we do not reach the Federal Plaintiffs' argument that the actions of the SHC and other charities should be imputed to the Kingdom for FSIA purposes.  The World Trade Center Plaintiffs argue that a foreign state without immunity has no Due Process rights that limit the Court's exercise of personal jurisdiction over it.  But see Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1020 (2d Cir. 1991) ("There must be sufficient 'minimum contacts' between the foreign state and the forum 'such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945))).  We likewise need not reach that argument.

38

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--

. . .

(5) not otherwise encompassed in paragraph (2) above,[12] in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to--

(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

28 U.S.C. § 1605. Congress enacted the Torts Exception "to eliminate a foreign state's immunity for traffic accidents and other torts committed in the United States, for which liability is imposed under domestic tort law." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439-

---

[12] Paragraph (2) is the Commercial Activities Exception. See Section V, infra.

40 (1989); see also MacArthur Area Citizens Ass'n v. Republic of Peru, 809 F.2d 918, 921 (D.C. Cir. 1987) ("[A]lthough cast in general terms, the 'tortious act' exception was designed primarily to remove immunity for cases arising from traffic accidents.  This is scarcely to say that the exception applies only to traffic accidents; rather, the point is that the legislative history counsels that the exception should be narrowly construed so as not to encompass the farthest reaches of common law." (internal citations omitted)); Asociacion de Reclamantes v. United Mexican States, 735 F.2d 1517, 1525 (D.C. Cir. 1984) (Scalia, J.) ("The primary purpose of the 'tortious act or omission' exception of § 1605(a)(5) was to enable officials and employees of foreign sovereigns to be held liable for the traffic accidents which they cause in this country, whether or not in the scope of their official business.").

The plaintiffs allege that the defendants' tortious conduct took the form of providing material support to terrorists.  A different statutory exception—-the Terrorism Exception-—governs precisely those activities.  The Terrorism Exception (with some ellipses) is set out in the

40

margin.[13]

---

[13] (a) In general.--

> (1) No immunity.--A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.
>
> (2) CLAIM HEARD.--The court shall hear a claim under this section if--
>
> > (A)(i)(I) the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section; or
> >
> > (II) in the case of an action that is refiled under this section by reason of section 1083(c)(2)(A) of the National Defense Authorization Act for Fiscal Year 2008 or is filed under this section by reason of section 1083(c)(3) of that Act, the foreign state was designated as a state sponsor of terrorism when the original action or the related action under section 1605(a)(7) (as in effect before the enactment of this section) or section 589 of the Foreign Operations, Export Financing,

and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208) was filed;

(ii) the claimant or the victim was, at the time the act described in paragraph (1) occurred--

(I) a national of the United States;

(II) a member of the armed forces; or

(III) otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment; and

(iii) in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration;

. . . .

(c) PRIVATE RIGHT OF ACTION.--A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to--

(1) a national of the United States,

(2) a member of the armed forces,

(3) an employee of the Government of the United States, or of an individual performing

42

a contract awarded by the United States Government, acting within the scope of the employee's employment, or

(4) the legal representative of a person described in paragraph (1), (2), or (3),

for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

(d) ADDITIONAL DAMAGES.--After an action has been brought under subsection (c), actions may also be brought for reasonably foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies, by reason of the same acts on which the action under subsection (c) is based.

. . . .

(h) DEFINITIONS.--For purposes of this section--

. . . .

(6) the term 'state sponsor of terrorism' means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law,

43

Congress enacted the first iteration of the Terrorism Exception in 1996 in order to "give American citizens an important economic and financial weapon against . . . outlaw states" that sponsor terrorism by providing "safe havens, funding, training, supplying weaponry, medical assistance, false travel documentation, and the like." H.R. Rep. No. 104-383, at 62 (1995). An FSIA exception for terrorist acts "had long been sought by victims' groups," but it "had been consistently resisted by the executive branch," which feared that such an amendment to the FSIA "might cause other nations to respond in kind, thus potentially subjecting the American government to suits in foreign countries for actions taken in the United States." Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 89 (D.C. Cir. 2002). The resulting provision, 28 U.S.C. § 1605(a)(7)

---

is a government that has repeatedly provided support for acts of international terrorism . . .

28 U.S.C. § 1605A. On January 28, 2008, while this appeal was pending, the Terrorism Exception was superseded and replaced. See Pub. L. No. 110-181 (2008). The panel solicited and the parties provided letter briefs addressing what impact, if any, this change in the law has on this case.

(repealed 2008) bore "notable features which reveal the delicate legislative compromise out of which it was born," the primary one being that it applied only to designated state sponsors of terrorism. Id. When Congress amended the Terrorism Exception in 2008, that limitation was preserved. 28 U.S.C. § 1605A(a)(2)(A)(i)(I) (requiring that the foreign state have been "designated as a state sponsor of terrorism" by the State Department").

The State Department has never designated the Kingdom a state sponsor of terrorism. As a consequence, the Terrorism Exception is inapplicable here. No plaintiff argues otherwise. But to apply the Torts Exception where the conduct alleged amounts to terrorism within the meaning of the Terrorism Exception would evade and frustrate that key limitation on the Terrorism Exception.

By definition, the acts listed in the Terrorism Exception are torts. If the Torts Exception covered terrorist acts and thus encompassed the conduct set forth in the Terrorism Exception, there would be no need for plaintiffs ever to rely on the Terrorism Exception when filing suit. An important procedural safeguard--that the foreign state be designated a state sponsor of terrorism--

45

would in effect be vitiated.  We decline to read the statute in a way that would deprive the Terrorism Exception (or its limitations) of meaning.  Williams v. Taylor, 529 U.S. 362, 404 (2000) ("It is . . . a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." (internal citation and quotation marks omitted)).  To assure that the FSIA serves its purpose, its exceptions must be separately administered.

We and our sister circuits have repeatedly rejected efforts to shoehorn a claim properly brought under one exception into another.  See, e.g., Garb v. Republic of Poland, 440 F.3d 579, 588 (2d Cir. 2006) (declining to credit plaintiffs' invocation of the Commercial Activities Exception, which "simply recharacterize[d] plaintiffs' 'takings' argument"); Chuidian, 912 F.2d at 1106 ("To hold otherwise would be to allow plaintiffs to escape the requirements of section 1605(a)(3) through artful recharacterization of their takings claims."); De Sanchez v. Banco Cent. de Nicaragua, 770 F.2d 1385, 1399 (5th Cir. 1985) ("Because [the plaintiff's] claim for conversion is in essence a property rather than a tort claim, we hold that [the Torts Exception] does not apply."); Alberti v. Empresa

46

*Nicaraguense De La Carne*, 705 F.2d 250, 254 (7th Cir. 1983) ("The basis of this lawsuit is the nationalization of Empacadora, which is a quintessential Government act. Plaintiffs cannot transform this governmental dispute into a commercial dispute through the simple expedient of attempting to offset an unrelated commercial debt." (internal citations omitted)).

Plaintiffs' textual argument focuses on the feature of the Torts Exception that reinstates foreign sovereign immunity for a particular class of torts: malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit and interference with contract rights. 28 U.S.C. § 1605(a)(5)(B). The plaintiffs contend that if Congress intended to do the same for "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources," 28 U.S.C. § 1605A, it could have done so explicitly. Cf. *Russello v. United States*, 464 U.S. 16, 23 (1983). But the Terrorism Exception applies "in any case not otherwise covered by this chapter." 28 U.S.C. § 1605A(a)(1). In other words, the Terrorism Exception stands alone. If acts of terrorism are considered torts for the purposes of the Torts Exception,

47

then any claim that could be brought under the Terrorism Exception could also be brought under the Torts Exception. If this were so, the Terrorism Exception would be drained of all force because every potential case would be "otherwise covered by this chapter"--namely, the Torts Exception. So, claims based on terrorism must be brought under the Terrorism Exception, and not under any other FSIA exception.

The plaintiffs predict that several untoward consequences will flow from reading the Torts Exception not to cover their claims. Some of these concerns have been remedied by the amended version of the Terrorism Exception, as explained in the margin.[14] The remainder overlook what is at stake here: civil liability. That a foreign sovereign is immune to civil claims brought by the victims of its alleged wrongdoing does not mean it has unfettered discretion to

---

[14] For instance, the Vigilant Plaintiffs protested that the prior version of the Terrorism Exception would leave those who suffered property damage without means of recovery. The amended version solves that problem--it provides federal jurisdiction and a private cause of action "for reasonably foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies" as a consequence of state-sponsored terrorism. 28 U.S.C. § 1605A(d). Moreover, the amended version of the Terrorism Exception expands the class of claimants beyond United States nationals to members of our armed forces and employees of our government. 28 U.S.C. § 1605A(a)(2)(A) (i)(II), (III).

commit atrocities against United States nationals. Deterrence (or punishment) does not begin and end with civil litigation brought by individual plaintiffs. Our government has other means at its disposal--sanctions, trade embargos, diplomacy, military action--to achieve its foreign policy goals and to deter (or punish) foreign sovereigns. Although the FSIA did open an avenue of redress for certain individual victims of state-sponsored terrorism, it did not delegate to the victims, their counsel and the courts the responsibility of the executive branch to make America's foreign policy response to acts of terrorism committed by a foreign state, including whether federal courts may entertain a victim's claim for damages.

We therefore hold that the Torts Exception does not apply here.[15]

---

[15] The defendants raise three other challenges to the application of the Torts Exception: since the Torts Exception is limited to torts that are both committed and felt within the United States, it does not concern a tortious act committed abroad, even if it has effects on United States soil; the "discretionary function" exclusion to the Torts Exception reinstates sovereign immunity; and, for lack of causation, the plaintiffs fail to state a claim in tort in any event. Because we hold that the Torts Exception does not apply to the plaintiffs' allegations, it is unnecessary to reach these additional arguments.

49

**V**

The Federal Plaintiffs characterize the defendants' charitable contributions as a form of money laundering, argue that money laundering is commercial in nature, and ask us to conclude that the Commercial Activities Exception defeats the defendants' immunity for harm caused by their charitable contributions.  The same analysis that renders inapplicable the Torts Exception likewise defeats this argument.  See Part IV.  Moreover, existing authorities make clear that the Commercial Activities Exception does not apply here.

The FSIA's Commercial Activities Exception defeats foreign sovereign immunity in cases

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).  "Commercial activity" is defined as "a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  The next sentence advises that "the commercial character of an

50

activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." Id. The Supreme Court has criticized the circularity of this definition, which

> leaves the critical term "commercial" largely undefined: The first sentence simply establishes that the commercial nature of an activity does not depend upon whether it is a single act or a regular course of conduct; and the second sentence merely specifies what element of the conduct determines commerciality (i.e., nature rather than purpose), but still without saying what "commercial" means.

Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 612 (1992). See also Saudi Arabia v. Nelson, 507 U.S. 349, 359 (1993) ("If this is a definition, it is one distinguished only by its diffidence.").

Happily, "the FSIA was not written on a clean slate." Weltover, 504 U.S. at 612. Rather, it codified the "restrictive" theory of foreign sovereign immunity used by the State Department between 1952 and the passage of the FSIA in 1976. In a case decided in that era, the Supreme Court explained (without disagreement from the dissenters) that "[i]n their commercial capacities, foreign governments do not exercise powers peculiar to sovereigns. Instead,

51

they exercise only those powers that can also be exercised by private citizens." Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 704 (1976). The Supreme Court adhered to this standard in construing the FSIA: "[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." Weltover, 504 U.S. at 614; see also Letelier v. Republic of Chile, 748 F.2d 790, 796, 797 (2d Cir. 1984) ("Letelier II") (inquiring into "whether the activity is of the type an individual would customarily carry on for profit," or that of a "merchant in the marketplace"). The FSIA asks

> not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in "trade and traffic or commerce."

Weltover, 504 U.S. at 614 (citing Black's Law Dictionary 270 (6th ed. 1990)). So, regulation of "foreign currency exchange is a sovereign activity . . . whereas a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts

52

to acquire goods." Id. at 614-15.  In the same way, "a foreign state's exercise of the power of its police has long been understood for purposes of the restrictive theory as peculiarly sovereign in nature," because "[e]xercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce."[16] Nelson, 507 U.S. at 361-62.

With this distinction in mind, "our first task is to identify what particular conduct in this case is relevant." Texas Trading & Milling Corp. v. Fed. Republic of Nigeria, 647 F.2d 300, 308 (2d Cir. 1981); see also Nelson, 507 U.S. at 356 ("We begin our analysis by identifying the particular conduct on which the [plaintiffs'] action is 'based' for

---

[16] The House Report provides additional examples:

> [A] contract by a foreign government . . . to construct a government building . . . [or] to make repairs on an embassy building . . . should be considered to be commercial contracts, even if their ultimate object is to further a public function.  By contrast, a foreign state's mere participation in a foreign assistance program administered by the Agency for International Development (AID) is an activity whose essential nature is public or governmental, and it would not itself constitute a commercial activity.

House Report at 16.

purposes of the Act."). The Federal Plaintiffs focus on what they term "the sovereign defendants' money laundering activities on behalf of al Qa[e]da," and argue that the law draws no bright line between "commercial" activities that are legitimate and those that are criminal. We understand the Federal Plaintiffs' argument to be as follows: the defendants donated money to charities with the intent that it be funneled to terrorist organizations which, in turn, would use that money to purchase the plane tickets, communications devices and weapons necessary to orchestrate the September 11 attacks.

This argument fails because "it goes to purpose, the very fact the Act renders irrelevant to the question of an activity's commercial character." Nelson, 507 U.S. at 363. It does not matter that the defendants made (and oversaw) donations to charities with a specific intent as to where those donations would end up. The alleged conduct itself-- giving away money--is not a commercial activity. Granted, donating to charities is among "those powers that can also be exercised by private citizens,'" Alfred Dunhill, 425 U.S. at 704,--unlike (say) "participation in a foreign assistance program administered by the Agency for International

54

Development . . . whose essential nature is public or governmental," House Report at 16.  But inquiry under the Commercial Activities Exception is not just whether the act was public (jure imperii) or private (jure gestionis); it also matters "whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'"  Weltover, 504 U.S. at 614.  In this context, the Four Princes' donations to charity are not part of the trade and commerce engaged in by a "merchant in the marketplace."  Letelier II, 748 F.2d at 796.  Consequently, the Commercial Activities Exception does not apply.[17]


**VI**

The remaining issue is the district court's personal jurisdiction over the Four Princes in their personal capacities, and over Prince Mohamed (who is sued in no other

---

[17] As we conclude that the defendants' conduct falls outside the FSIA's definition of "commercial activity," we need not consider whether a criminal act (e.g., money laundering) can ever be considered commercial for purposes of the FSIA.

55

capacity).  The plaintiffs have the burden of showing that these individuals have "certain minimum contacts with [the United States] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).  See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999) (where the defendants have moved to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant"); Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996) (same).  "In determining whether a plaintiff has met this burden, we will not draw 'argumentative inferences' in the plaintiff's favor."  Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994) (quoting Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992)).  Moreover, "we are not bound to accept as true a legal conclusion couched as a factual allegation." Jazini v. Nissan Motor Corp., 148 F.3d 181, 185 (2d Cir. 1998) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Due process mandates that a defendant's "conduct and

connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). The "'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-73 (1985) (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984) and Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984)). Put differently, personal jurisdiction is proper where the defendant took "intentional, and allegedly tortious, actions . . . expressly aimed" at the forum state. Calder v. Jones, 465 U.S. 783, 789 (1984); see also In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 208 (2d Cir. 2003) (citing Calder for proposition that a "court may exercise personal jurisdiction over defendant consistent with due process when defendant is a primary participant in intentional wrongdoing--albeit extraterritorially--expressly directed at forum"). Mere foreseeability of harm in the forum state is insufficient. Burger King, 471 U.S. at 474.

**A**

The plaintiffs rely on five opinions from other circuits for the idea that the Four Princes' alleged involvement in a terrorist attack on a citizen of the United States constitutes purposeful direction at this forum, "such that [they] should reasonably anticipate being haled into court" here. Burger King, 471 U.S. at 474. But those cases all addressed defendants who were primary participants in terrorist acts. In Mwani v. bin Laden, 417 F.3d 1 (D.C. Cir. 2005), the court exercised personal jurisdiction over al Qaeda and Osama bin Laden for injuries arising out of the bombing of our embassies in Kenya and Tanzania, reasoning that their "decision to purposefully direct their terror at the United States, and the fact that the plaintiffs' injuries arose out of one of those terrorist activities, should suffice to cause the defendants to 'reasonably anticipate being haled into' an American court." Id. at 14 (quoting Burger King, 471 U.S. at 474). Similarly, the defendant in Morris v. Khadr, 415 F. Supp. 2d 1323 (D. Utah 2006), was an al Qaeda member who "actively participated in and helped plan al Qaeda's terrorist agenda--so much so, in

58

fact, that he convinced his son to risk his life and attack American soldiers" in Afghanistan, killing the plaintiffs' relatives in the course of engagement.  Id. at 1336.  Two other cases dealt with civil claims against Libya (a designated state sponsor of terrorism) and its intelligence service for the bombing of commercial airplanes.  Pugh v. Socialist People's Libyan Arab Jamahiriya, 290 F. Supp. 2d 54, 59 (D.D.C. 2003) ("[T]he individual defendants . . . conspired to sabotage and succeeded in destroying a civilian commercial aircraft filled to capacity . . . on an international flight and expected to stop in several nations before reaching its final destination, [and so] the individual defendants could and should have reasonably postulated that passengers of many nationalities would be on board, from which they could also expect they might be haled into the courts of those nations whose citizens would die."); Rein v. Socialist People's Libyan Arab Jamahiriya, 995 F. Supp. 325, 330 (E.D.N.Y. 1998) ("This case concerns the destruction [by Libya and its agents] of a United States flag aircraft, which was manufactured and ow[n]ed by United States corporations, while en route to the United States on a regularly scheduled flight with 189 United States

nationals on board."). Finally, in Daliberti v. Republic of Iraq, 97 F. Supp. 2d 38 (D.D.C. 2000), the court exercised jurisdiction over Iraq (then designated a state sponsor of terrorism) for conduct within the Terrorism Exception. The court reasoned that the abuse of the American plaintiffs "had a direct effect in the United States and was consciously designed to affect United States policy. Under the circumstances, Iraq cannot now claim surprise at the assertion of jurisdiction by this Court over claims brought in response to its actions." Id. at 54.

The plaintiffs do not allege that the Four Princes directed the September 11 attacks or commanded an agent (or authorized al Qaeda) to commit them. Cf. Calder, 465 U.S. at 790 (affirming that court could exercise personal over "primary participants in an alleged wrongdoing intentionally directed at a California resident" (emphasis added)). Rather, the plaintiffs rely on a causal chain to argue a concerted action theory of liability: the Princes supported Muslim charities knowing that their money would be diverted to al Qaeda, which then used the money to finance the September 11 attacks. Cf. Halberstam v. Welch, 705 F.2d 472, 478 (D.C. Cir. 1983) (distinguishing between civil

60

conspiracy and aiding-abetting liability under the common law of torts); Boim v. Quranic Literacy Inst., 291 F.3d 1000, 1028 (7th Cir. 2002) (defining extent to which charities' alleged provision of material support to Hamas constituted an act of "international terrorism" such that charities could be civilly liable for injuries caused by Hamas).

Even if the Four Princes were reckless in monitoring how their donations were spent, or could and did foresee that recipients of their donations would attack targets in the United States, that would be insufficient to ground the exercise of personal jurisdiction. See Burger King, 471 U.S. at 474 ("Although it has been argued that foreseeability of causing injury in another State should be sufficient to establish such contacts there when policy considerations so require, the Court has consistently held that this kind of foreseeability is not a 'sufficient benchmark' for exercising personal jurisdiction." (internal footnote omitted)). Rather, the plaintiffs have the burden of showing that the Four Princes engaged in "intentional, and allegedly tortious, actions . . . expressly aimed" at residents of the United States. Calder, 465 U.S. at 789.

61

That burden is not satisfied by the allegation that the Four Princes intended to fund al Qaeda through their donations to Muslim charities. Even assuming that the Four Princes were aware of Osama bin Laden's public announcements of jihad against the United States and al Qaeda's attacks on the African embassies and U.S.S. Cole, their contacts with the United States would remain far too attenuated to establish personal jurisdiction in American courts. It may be the case that acts of violence committed against residents of the United States were a foreseeable consequence of the princes' alleged indirect funding of al Qaeda, but foreseeability is not the standard for recognizing personal jurisdiction. Rather, the plaintiffs must establish that the Four Princes "expressly aimed" intentional tortious acts at residents of the United States. Calder, 465 U.S. at 789. Providing indirect funding to an organization that was openly hostile to the United States does not constitute this type of intentional conduct. In the absence of such a showing, American courts lacked personal jurisdiction over the Four Princes.

62

**B**

It is alleged that in his capacity as an executive of various private banks, Prince Mohamed knowingly and intentionally provided material support to terrorists who, in turn, planned to attack the United States. The allegations are as follows.

Until 2002, Mohamed served as the Chairman and CEO of DMI, a bank headquartered in Switzerland with operations throughout the world. "DMI has actively sponsored and supported the al Qa[e]da movement through several of its subsidiaries, including but not limited to the Islamic Investment Company of the Gulf, the Faisal Islamic Bank of Bahrain, Faisal Finance, Tadamon Islamic Bank, and Al Shamal Islamic Bank." DMI and its subsidiaries conform to sharia, the principle under Islamic law that "prohibits the earning or payment of interest." The plaintiffs ask the Court to draw a "reasonable inference" that because of sharia, there exists "an active, not passive, relationship among an Islamic bank, its owners, and its large depositors." In other words, the owners of DMI and its subsidiaries "are close business partners with bank 'customers' in a partnership or collaboration to manage and invest customers'

capital in a mutually beneficial way." Osama bin Laden, his bodyguard, and other al Qaeda operatives had deposits with DMI and its subsidiaries. (Also, bin Laden himself invested $50 million in one of DMI's subsidiaries.) Therefore, argue the plaintiffs, the September 11 attacks "were a direct result of the material support that Prince Mohamed . . . provided al Qaeda."

Mohamed disputes this characterization of sharia banking; but even assuming its accuracy, it does not reflect that Mohamed engaged in "intentional" conduct "expressly aimed at the United States. <u>Calder</u>, 465 U.S. at 789. It may be that, but for access to financial institutions, al Qaeda could not have funded its terrorist attacks. But that does not mean that the managers of those financial institutions "purposefully directed" their "activities at residents of [this] forum." <u>Burger King</u>, 471 U.S. at 472. Moreover, Mohamed himself was never a director, officer, shareholder or employee of the banks that purportedly held terrorists' deposits. He is related to those institutions only insofar as the Faisal Islamic Bank of Bahrain (which he once managed) invested in them. For the same reasons explained above, we decline to read <u>Mwani</u>, <u>Morris</u>, <u>Pugh</u>,

Daliberti and Rein, supra, to say that the provision of financial services to an entity that carries out a terrorist attack on United States citizens could make Prince Mohamed, in the circumstances presented here, subject to the jurisdiction of American courts.

The Ashton Plaintiffs argue in passing that we can impute the banks' actions to Mohamed, subjecting him to personal jurisdiction in the United States.  This argument relies on Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460 (1988), which held that the "fiduciary shield doctrine" does not defeat personal jurisdiction under New York's long-arm statute.  Id. at 472.  The fiduciary shield doctrine deems it "unfair to subject a corporate employee personally to suit in a foreign jurisdiction when his only contacts with that jurisdiction have been undertaken on behalf of his corporate employer."  Id. at 467-68; Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 902 n.3 (2d Cir. 1981) ("The fiduciary shield doctrine is not a constitutional principle, but is rather a doctrine based on judicial inference as to the intended scope of the long arm statute.").  Consequently, jurisdiction was held proper in Kreutter over an individual who, as a primary actor, "represented two

corporations during their participation in purposeful corporate acts" in the state. Kreutter, 712 N.Y.2d at 470.

Kreutter is plainly inapposite. There is no allegation that Mohamed served as the "primary actor" or "representative" of a foreign corporation that transacted business within the United States. Instead, the Ashton Plaintiffs allege that Mohamed was the "primary actor" who "ran, directed or controlled" various banks in the Kingdom, Switzerland and the Sudan. It may be that Mohamed was a "primary actor" with regard to the operations of certain foreign banks that conducted business with al Qaeda. However, none of those business dealings are alleged to have taken place in the United States—-unlike the "purposeful corporate acts" that took place in New York in Kreutter. 71 N.Y. 2d at 470. Because the transactions that Mohamed allegedly supervised had no direct contact with the United States, Mohamed was not a "primary actor" in any transaction that would cause him to be subject to the jurisdiction of American courts pursuant to Kreutter.

We affirm the district court's dismissal of all claims against Mohamed for lack of personal jurisdiction.

**C**

The plaintiffs challenge the district court's denial of their motions for jurisdictional discovery. "Since [Plaintiffs] did not establish a prima facie case that the district court had jurisdiction over [the defendants], the district court did not err in denying discovery on that issue." Jazini, 148 F.3d at 186.

**CONCLUSION**

For the foregoing reasons, we affirm.