*Hussein v. Maait*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2022

(Submitted: February 14, 2023    Decided: February 19, 2025)

Docket No. 22-1506

DR. AHMED DIAA ELDIN ALI HUSSEIN,

*Plaintiff-Appellant*,

–v.–

DR. MOHAMED AHMED MAAIT, IN HIS OFFICIAL CAPACITY AS
MINISTER OF FINANCE OF THE ARAB REPUBLIC OF EGYPT,

*Defendant-Appellee.*

B e f o r e :

SACK, CARNEY, and NATHAN, *Circuit Judges*.

Plaintiff-Appellant Dr. Ahmed Diaa Eldin Ali Hussein is a dual citizen of the Arab Republic of Egypt and of the United States. Hussein, who has residences in both Egypt and the United States, seeks enforcement in the United States of an Egyptian administrative court ruling and a related ministerial decree (together, the "Egyptian Judgment"). Payment of the Egyptian Judgment would purportedly compensate Hussein for Egypt's expropriation in the 1990s of Hussein's shares in an Egyptian company, the SIMO Middle East Paper Company. His enforcement action in New York

State court named Dr. Mohamed Ahmed Maait, in his official capacity as Minister of Finance of Egypt, as defendant. Maait removed the suit from New York state court to the United States District Court for the Southern District of New York, *see* 28 U.S.C. § 1441(d) (authorizing removal of suits against foreign states), but filed his removal notice after the presumptive 30-day deadline, *see id.* § 1446. The District Court (Rakoff, *J.*) found that Maait could avail himself of Section 1441(d) because Egypt was implicated in the suit and also found "cause" under Section 1441(d) to enlarge the time for removal. It then dismissed the suit under Fed. R. Civ. P. 12(b)(1), concluding that Egypt is the real party in interest and that it is immune under the Foreign Sovereign Immunities Act ("FSIA"), because Hussein failed to establish that any exception under the FSIA applies. *See* 28 U.S.C. §§ 1332, 1391, 1441, 1601 et seq. Hussein now appeals. On clear error review of factual findings and de novo review of the legal conclusion, we affirm the District Court's determination that Egypt is the real party in interest in Hussein's suit, that the FSIA applies, and that it affords presumptive immunity to Maait. *See Samantar v. Yousuf*, 560 U.S. 305, 324–26 (2010). Reviewing for abuse of discretion the District Court's finding of "cause" under Section 1441(d) to enlarge the timing for noticing removal, we identify no error. Finally, we determine that Hussein has waived any argument regarding the application of any exception to FSIA immunity. Accordingly, we AFFIRM the judgment of the District Court dismissing the suit for want of jurisdiction.

———————

Jonathan R. Jeremias, Alan E. Sash, McLaughlin & Stern, LLP, New York, NY, *for Plaintiff-Appellant*.

Linda Goldstein, Dechert LLP, New York, NY; Tiffany E. Engsell, Dechert LLP, Philadelphia, PA, *for Defendant-Appellee*.

———————

CARNEY, *Circuit Judge*:

This case requires us to consider when a suit against an individual foreign government official is properly treated as an action against the foreign state itself, as the real party in interest, for purposes of the Foreign Sovereign Immunities Act (the "FSIA"). 28 U.S.C. §§ 1332, 1391, 1441, 1601–1611. We also consider the standards under

2

which we will review a district court's finding of "cause" to enlarge the time for a foreign state to file a notice of removal. *Id.* § 1441.

Plaintiff-Appellant Dr. Ahmed Diaa Eldin Ali Hussein ("Hussein"), a resident of the Arab Republic of Egypt ("Egypt") and of New York State, is a dual citizen of Egypt and of the United States. In 1999, Hussein alleges, the Egyptian government effectively seized his shares in the SIMO Middle East Paper Company ("SIMO"), a business organization based in Egypt. The seizure purportedly caused him a loss of over $15 million. Hussein maintains that two later official acts of Egypt—a judgment entered by an Egyptian administrative court and a decree issued by its former Prime Minister, which Hussein refers to collectively as the "Egyptian Judgment"—established his entitlement to an award of damages and amount to a "foreign country judgment" that is enforceable in New York state courts. *See* N.Y. CPLR 5301, 5302, 5303.

After years of failed collection attempts elsewhere, Hussein proceeded by filing an action in New York State Supreme Court, New York County under N.Y. CPLR 3213 ("Motion for Summary Judgment in Lieu of Complaint"), seeking enforcement of the Egyptian Judgment. He named Egypt's then-Minister of Finance, Defendant-Appellee Dr. Mohamed Ahmed Maait ("Maait"), in Maait's official capacity, as defendant in the action. Maait, who was served in Egypt through a governmental agency there, eventually removed the action to the United States District Court for the Southern District of New York, maintaining that Egypt, not he, is the real party in interest in Hussein's action. Accordingly, he urged, removal to a federal court was proper under 28 U.S.C. § 1441(d), which allows removal of civil actions "against foreign States." He further claimed that he established the requisite statutory "cause" to permit his late removal notice under Section 1441(d), and that Egypt (and hence, he) was presumptively immune from Hussein's suit under the FSIA and that no exception to the sovereign's presumptive immunity applied. *See* 28 U.S.C. §§ 1604, 1605.

3

Hussein unsuccessfully sought remand to the state court. The District Court (Rakoff, *J.*) agreed with Maait that Egypt is the real party in interest; that Maait showed "cause" under Section 1441(d) to enlarge the time for removal; that the FSIA governs the proceeding against Maait as if it had been brought against Egypt itself; and that Maait, as a proxy for Egypt, was therefore presumptively immune. The District Court then granted Maait's Rule 12(b)(1) motion and dismissed the suit for lack of subject matter jurisdiction, ruling that Hussein failed to establish that any exception under the FSIA to Egypt's sovereign immunity applies. Hussein now appeals.

On review, we adopt the District Court's conclusion that Egypt is the real party in interest in Hussein's suit and that Maait was therefore entitled to exercise Egypt's removal right under Section 1441(d). We further hold that a district court's decision to extend the time for removal under the "for cause" provision of Section 1441(d) is subject to abuse of discretion review and, on such review, Hussein's timeliness challenge to Maait's removal fails. Finally, we rule that the presumptive immunity afforded Egypt by the FSIA shelters Maait (and Egypt) here, and that Hussein has waived any argument that an exception to that immunity applies.

We therefore **AFFIRM** the judgment of the District Court.

## BACKGROUND

### I.   Statutory background

#### A.   The FSIA

The FSIA's enactment in 1976 "marked a watershed moment in the foreign relations law of the United States." *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 102–03 (2d Cir. 2017). In the FSIA, Congress established "a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies or instrumentalities." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983). The FSIA's modern,

4

"comprehensive framework," *Republic of Austria v. Altmann*, 541 U.S. 677, 699 (2004), of presumptive immunity replaced the then-prevailing "executive [branch]-driven, factor-intensive, loosely common-law-based immunity regime" that had long been applied to foreign sovereigns haled into United States courts, *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 141 (2014). As the Supreme Court has since taught, "[a]fter the enactment of the FSIA, the Act—and not the pre-existing common law—indisputably governs the determination of whether a foreign state is entitled to sovereign immunity." *Samantar v. Yousuf*, 560 U.S. 305, 313 (2010).

In addition to this regime of presumptive immunity from liability, the FSIA affords foreign sovereigns certain procedural protections: for example, it extends the time within which the sovereign must answer a complaint in state or federal court, 28 U.S.C. § 1608(d); it entitles the sovereign to a bench trial in federal court, *id.* § 1330(a); and—at issue here—it authorizes the sovereign to remove any case against it from state to federal court, subject to certain timing constraints, *id.* § 1441(d).

### B.     Common law protections for foreign officials

In 2010, in *Samantar v. Yousuf*, the Supreme Court ruled that the FSIA's protections do not ordinarily extend to individual officials of a foreign sovereign, notwithstanding the statute's coverage of the foreign sovereign's "agenc[ies]" and "instrumental[ies]," which had earlier been understood to reach officials as well. *See Samantar*, 560 U.S. at 314–19; *see also In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 80–81 (2d Cir. 2008) (holding that "an individual official of a foreign state acting in his official capacity is the 'agency or instrumentality' of the state," which was subsequently abrogated by *Samantar*). The Court ruled squarely that an "individual sued for conduct undertaken in his official capacity" is neither a "foreign state" nor an "agency or instrumentality of a foreign state" under the FSIA. *Samantar*, 560 U.S. at 314–19 (construing 28 U.S.C. § 1603(a), (b)).

But the *Samantar* Court was also unequivocal that the FSIA did not extinguish the preexisting, common law-based protections for foreign government officials sued for their official acts; rather, it preserved them. *See id.* at 319–22, 325–26; *see also Yousuf v. Samantar*, 699 F.3d 763, 768–69 (4th Cir. 2012) (on remand from Supreme Court, analyzing a foreign official's entitlement to common law "head-of-state immunity" or "foreign official" immunity). The Court further acknowledged that, in some circumstances, an action against a foreign official will implicate the related foreign sovereign to such a degree that the action will be best understood as an action against the foreign state itself. In those circumstances, the Court advised, "the state is the real party in interest," and the FSIA will govern the action. *Samantar*, 560 U.S. at 325 (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

With these principles in mind, we turn to the present controversy.

## II. Factual background

We set out the facts as initially alleged by Hussein in his state court affidavit and motion for summary judgment in lieu of complaint, as later expanded on through the parties' declarations and exhibits filed in the District Court, including Hussein's request for arbitration with Egypt. Because we review the District Court's dismissal for lack of jurisdiction, we properly consider these materials in addition to the initial district court submissions. *See Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008); *see also Hussein v. Maait*, 607 F. Supp. 3d 374, 377 n.1 (S.D.N.Y. 2022). The relevant facts are largely undisputed.

### A. <u>Hussein and his investment in SIMO</u>

Hussein resides primarily in Egypt, but also maintains an apartment in New York City. In 1994, he "partnered" with the National Bank of Egypt to found the National Investment Company ("NIC"), an investment bank incorporated in Egypt.

6

App'x at 38 ¶ 3. In 1997, he purchased "all the shares" of NIC and transferred them to a holding company that "owned [his] personal investments in Egypt." *Id.* at 39 ¶ 4. Also in 1997, either he or the holding company purchased a stake of approximately 72 percent in SIMO Middle East Paper Company, a manufacturer and seller of paper products. He accomplished the shares purchase through "an open-market transaction." *Id.* at 39 ¶ 6. His investment in SIMO was "equivalent to approximately $15.714 million at the time that it was made." *Id.* at 39 ¶ 7. SIMO was formed as a private company in 1945, but from 1961 until 1997, when Hussein made his first stock purchases in it, the Egyptian government owned all of SIMO's issued shares.

In 1999, the Chairman of Egypt's Companies' Regulatory Authority wrested control of SIMO from its board of directors and gave management authority of the company to "the Egyptian government," "effectively expropriating all of the shares of SIMO." *Id.* at 39 ¶ 9.[1] Hussein then "immediately instituted legal action" to "obtain compensation" for his "illegal[ly] tak[en]" shares. *Id.* at 39 ¶ 11. His legal actions led to Egyptian court rulings in 2005 and 2006 that directed SIMO's return to its "rightful owners" and awarded damages to the wronged shareholders, apparently including Hussein. *Id.* at 40 ¶¶ 13–14. But, he complains, the Egyptian government refused to honor these rulings.

No copies of those 2005 or 2006 court decisions or any of the related Egyptian appeals or proceedings that Hussein describes are in the record, and Hussein did not expressly seek to enforce these in his New York state court action. Instead, Hussein there sought recognition and enforcement of two separate official pronouncements in

---

[1] Hussein does not appear to allege that the Egyptian government itself ever took formal ownership of the SIMO shares in question. He does state, somewhat surprisingly, that he continued to acquire SIMO shares from 2000 through 2014, after the 1997 expropriation.

2014, one by an Egyptian administrative court and the other by the Egyptian Prime Minister. We describe these next.

**B.**     The "Egyptian Judgment"

Hussein uses the term "Egyptian Judgment" to refer to two separate official actions taken in Egypt in 2014: a judgment entered by an Administrative Justice Court ("Judgment 6193"), and a decree issued by Egypt's then-Prime Minister, Ibrahim Mahlab ("Decree 961"). App'x at 40 ¶ 17, 41 ¶ 19, 136–37.

The administrative court issued Judgment 6193 in April 2014.[2] The plaintiffs in those proceedings included several former SIMO employees, who sued Hussein, the Egyptian Stock Exchange, and several Egyptian government officials in their official capacities, seeking to "annul[]" SIMO's privatization in the 1990s and to cancel the SIMO shares sold to Hussein, his family, and his companies. *Id.* at 88–95, 120. Those plaintiffs who were former SIMO employees also sought reinstatement of their employment at SIMO.

After due consideration, the administrative court ruled that SIMO's privatization contract "became null and so it is necessary to issue the judgment with canceling and the annulment of the contract." App'x at 118.[3] The court directed that the Egyptian government "retrieve the company free from encumbrances" and that the former-

---

[2] The judgment referred to was issued in lawsuit No. 6193, filed in the Administrative Justice Court; it is not itself numbered "6193." For convenience we, like the parties, refer to the document as Judgment 6193.

[3] In our discussion of these texts, we use without amendment the language provided in the certified (but rough) translations of these documents from Arabic to English that are appended to Hussein's state court motion for summary judgment in lieu of complaint. App'x at 88–133 ("Judgment" in lawsuit No. 6193, issued by the "Administrative Justice Court, Economic & Investment Disputes Circle, Seventh Circle"); *id.* at 136–37 ("Prime Minister Decree No. 961 of the year 2014").

employee plaintiffs be reinstated. *Id.* at 120–21. The court awarded no specific money judgment to any plaintiff (and not to Hussein, either, who was in fact a *defendant* in those proceedings). Instead, the ruling appears to address only the compensation owed the former-employee plaintiffs, directing that they be permitted to "cash[] their financial dues in the manner mentioned in the reasons and obligates the defendants with their capacities with the expenses." *Id.* at 121–22. The decision announces no particular sums to be paid to any party.

A few months later, in June 2014, Egypt's then-Prime Minister, Ibrahim Mahlab, issued Decree 961. Decree 961 announced that the Prime Minister had "[d]ecided" that Judgment 6193 "be executed." *Id.* at 136. It further declared that SIMO "is returned back to sector of public businesses[,]" *id.*, and directed the "Minister of Finance" to "provide all necessary financial credits related to the shareholders' rights[,]" *id.* at 137. Decree 961 neither defined the "necessary financial credits," explained how to calculate them, nor identified any particular sums owing. Nor did it identify by name the individuals who were to receive the stated "necessary financial credits" or the particular "Minister of Finance" who was to facilitate the required payments. Finally, it left performance of these directives simply to "[t]he concerned agencies," which it did not list. *Id.* at 137.

Hussein now alleges that he was among those due "necessary financial credits" under Decree 961 and that, by failing to compensate SIMO shareholders as directed by the Prime Minister, the "Egyptian government" has violated the "final and binding Egyptian Judgment"—that is, Judgment 6193 and Decree 961. *Id.* at 42 ¶ 27; *see* Appellant's Br. at 6. Hussein further maintains that the Egyptian government and various Egyptian officials have repeatedly rebuffed his efforts to enforce the two mandates. He complains that, in the "seven years" before he sued in New York court, he communicated "repeatedly" with Egypt's Minister of Finance (for much of that time, Maait) as well as with several other government officials in an effort to obtain his due.

9

App'x at 41 ¶ 23. These Egyptian officials and "other responsible government representatives" advised him to bring the matter before Egypt's Ministerial Committee for Investment Dispute Settlement (the "MCIDS"), but when Hussein did so, MCIDS twice advised Hussein that it was "incompeten[t]" to "hear the current dispute[.]" *Id.* at 41–42 ¶¶ 23–25 (internal quotation marks omitted).

Abandoning those in-country efforts, Hussein attempted in February 2021 to initiate an arbitration with Egypt in the International Centre for Dispute Resolution, where he filed an arbitration complaint that sought among other relief, an award "ordering Respondent [Egypt] to compensate Claimant [Hussein] for the damages and losses suffered as a result of [Egypt's] breaches of the U.S.-Egypt [Bilateral Investment Treaty.]" *Id.* at 249. In the arbitration proceedings, he alleged that his investment in SIMO was worth approximately $20 million when made. *Id.* at 244.

That collection effort, too, failed, when "Egypt refused to consent to the arbitration." *Id.* at 42 ¶ 26.

## III. Procedural history in the United States

### A. New York State court proceedings

Hussein then turned to New York State courts, and in December 2021 in New York State Supreme Court, New York County, he filed a motion for summary judgment in lieu of complaint under N.Y. CPLR 3213.[4] He named Maait "in his official capacity as Minister of Finance of the Arab Republic of Egypt" as defendant. App'x at 19–20.

As sketched above, in this motion he requested a ruling "recognizing and enforcing the money judgment" embodied in Judgment 6193 and Decree 961. *Id.* at 19.

---

[4] Section 3213, within N.Y. CPLR Article 32 ("Accelerated Judgment"), establishes a streamlined judicial procedure for use "when an action is based upon an instrument for the payment of money only or upon any judgment . . . ." N.Y. CPLR 3213.

Hussein asserted that, under New York law, the two directives considered in tandem constitute a "foreign country judgment" that entitled him to use the accelerated procedures of Article 32. He stated that this "judgment" is one that "grants . . . recovery of a sum of money" and is "final, conclusive, and enforceable" in Egypt; and argued that it therefore must be recognized and enforced by the New York courts, as if it were a New York court judgment. *Id.* at 31–33 (quoting CPLR 5301,[5] 5302(a),[6] and 5303(a),[7] whose texts we set out in the margin).

Hussein further declared that, notwithstanding the absence of any statement regarding the particular sum due him in either component of the Egyptian Judgment, they entitled him to a payment of $15,756,622 plus interest calculated as of the date of the state court judgment. The sum represented his calculation of the amount of his initial investment in SIMO, translated from Egyptian to U.S. currency, he said. Two weeks later, he filed an Amended Summons and Notice scheduling a state court

---

[5] CPLR 5301 defines "[f]oreign country judgment" as "a judgment of a court of a foreign country."

[6] CPLR 5302(a) provides in relevant part:

> Except as otherwise provided in subdivision (b) of this section, the provisions of this article apply to a foreign country judgment to the extent that such judgment:
>
> > 1. grants or denies recovery of a sum of money; and
> >
> > 2. under the law of the foreign country where rendered, is final, conclusive and enforceable even though an appeal therefrom is pending or it is subject to appeal.

[7] CPLR 5303(a) provides in relevant part:

> Except as is otherwise provided [elsewhere in state or federal law], a court of this state shall recognize a foreign country judgment to which this article applies as conclusive between the parties to the extent that it grants or denies recovery of a sum of money.

hearing on his motion for August 25, 2022. The sole named defendant was "Dr. Mohamed Ahmed Maait, in his official capacity as Minister of Finance of the Arab Republic of Egypt." App'x at 50, 53.

On February 3, 2022, Hussein effected service of his New York state court papers on the Egyptian State Lawsuits Authority of the Arab Republic of Egypt ("ESLA")—the agency responsible for overseeing lawsuits brought against the Egyptian government and its officials, and itself based in Egypt. Hussein did so by following the ordinary FSIA formalities for serving foreign sovereigns. As required, his service package appended a copy of the FSIA and included an "FSIA Notice of Suit and Attachment." App'x at 58, 62–82. The FSIA Notice stated that "the above named defendant"—Maait— "can be defined under [28 U.S.C. § 1603(b)] as an agency of the foreign state of Egypt[.]" *Id.* at 63. The associated Request for Service Abroad form purported to "give notice to" defendant Maait, "in his official capacity as Minister of Finance of the Arab Republic of Egypt, of [Hussein's] claim for civil damages[.]" *Id.* at 60.

## B.     U.S. District Court proceedings

On March 30, 2022—roughly 25 days after the end of the 30-day presumptive statutory deadline—Maait filed a notice of removal in the Southern District of New York. His notice cited Section 1441(d), which (as described above) allows for the removal of any civil action "against a foreign state as defined in section 1603(a)" of the FSIA. 28 U.S.C. § 1441(d). Maait asserted that removal was available because Egypt, not Maait, was the real party in interest in Hussein's suit. Maait acknowledged that his removal notice was filed after the 30-day deadline set by Section 1446(b). He asserted that it was timely nonetheless, relying on Section 1441(d)'s provision that "[w]here removal is based upon this subsection, the time limitations of section 1446(b) of this chapter may be enlarged at any time for cause shown." *Id.* There was "cause" here sufficient to permit enlargement of the time for removal, he maintained, because he had

moved expeditiously and in good faith to obtain qualified United States counsel after being served in February. The state court docket showed no action by Hussein between the service date of February 3 and the removal date of March 30, so there had been no undue delay or prejudice, he posited.[8] And because, in Maait's view, Egypt was the real party in interest in the suit, permitting even a somewhat tardy removal would be consistent with Congress's general intention to have claims against foreign states adjudicated in federal court.

Hussein resisted: a week later, on April 8, he sought an order from the District Court remanding the case to state court. He denied that Maait had shown cause for enlargement of time in light of Maait's counsel's experience representing Egypt—but did not meaningfully contest in the papers filed that his action was essentially against Egypt. In response, Maait submitted sworn declarations from his personal lawyer and from counsel at the ESLA, detailing the efforts that the ESLA had made to identify and retain qualified United States counsel on Maait's behalf promptly after service was made on Maait through the ESLA in Egypt. Maait's counsel declared that these efforts were complicated by several factors: the Egyptian government's protocols for engaging foreign counsel; counsel's initial failure to provide signed copies of both the English and Arabic portions of the engagement letter; and the challenges of countersigning and exchanging hard copies of an engagement letter using international mail. Further, she received an executed copy of the engagement letter two weeks past the presumptive 30-day removal period; the demands of other professional commitments also contributed

---

[8] The only activity shown on the state court docket since the amended motion's filing pertains to the removal of the case to federal court: after removal, the state court case was dismissed without prejudice. The August 25 hearing noticed by Hussein, understandably, appears not to have occurred. Nor did Hussein file any proof of service on the state court docket.

13

to the tardy filing, but only by "a few days"; she averred that she had no strategic reason for waiting to file the notice of removal. App'x at 220 ¶ 6, 222 ¶ 10.

The District Court orally denied remand in the course of a scheduling conference with the parties. The District Judge ruled that the FSIA was "implicated" and then determined that "cause ha[d] more than amply been shown to enlarge the time limitations for removal" under Section 1441(d). *Id.* at 230. The court further commented that it was "hard for [him] to see how [Hussein would be] prejudiced" by removal, and predicted that the case would be resolved in the federal court more quickly than in state court in any event. *Id.* at 228–29.

Having secured the federal forum, Maait then moved to dismiss the summary judgment motion for both lack of jurisdiction and failure to state a claim. *See* Fed. R. Civ. P. 12(b)(1), (6). As to the jurisdictional ground, Maait argued that the FSIA governed the suit against him since Egypt was the real party in interest, and that because Hussein had failed to establish any of the FSIA's exceptions to immunity, dismissal was required. Hussein did not engage directly with the presumptive immunity point; rather, he focused on the argument that his claim fell within the FSIA's "commercial activity" exception.[9] But he offered little or nothing of substance to challenge the District Court's preliminary ruling that Egypt was "implicated by" or, as Maait urged, the real party in interest in his claim. He seemed to insist primarily that Maait's failure to transfer funds to him under the Egyptian Judgment was a personal wrong by Maait, and that by failing to make the type of payments directed by the Egyptian Judgment, Maait was liable to Hussein.

---

[9] The FSIA permits suit against a sovereign when "the action is based upon . . . an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]" 28 U.S.C. § 1605(a)(2).

14

After due consideration of the parties' submissions, the District Court granted Maait's motion to dismiss under Rule 12(b)(1). *Hussein*, 607 F. Supp. 3d at 376. It built on its prior statement that Egypt was "implicated," now ruling definitively in a written opinion that Egypt was the real party in interest in the suit against Maait. It further held Hussein accordingly bore the burden of establishing that his claim fell within one of the FSIA's exceptions to immunity. It then rejected Hussein's contention that his claim was covered by the exception for the sovereign's commercial activity. *See* 28 U.S.C. § 1605(a)(2).

In rejecting that contention, the District Court reasoned that the gravamen of Hussein's suit was the sovereign's uncompensated taking of his SIMO shares, which occurred in Egypt. That Hussein may have engaged in banking activities in the United States to fund his acquisition of SIMO shares had no bearing on the exception's application: Egypt had engaged in no commercial activity in the United States related to SIMO. *Hussein*, 607 F. Supp. 3d at 380. Nor did the taking, if it occurred elsewhere, have any "direct effect" in the United States, as would be required to take advantage of another part of the general "commercial activity" exception. *Id.* at 380–81 & n.3 (quoting 28 U.S.C. § 1605(a)(2)).

The District Court did not engage in a detailed analysis of Maait's real-party-in-interest claim: rather, it simply stated that it had already concluded that Egypt is the real party in interest and explained that this was one of the reasons it had denied Hussein's motion to remand. *See id.* at 378 ("[T]he Court denied Hussein's motion to remand on the ground that Egypt is the real party-in-interest and that the FSIA applies.").

Hussein timely appealed.

15

## DISCUSSION

Hussein contends on appeal that the District Court erred in denying his motion to remand the case to the state court. He argues primarily that the District Court did not have subject matter jurisdiction over the matter because the New York state suit was brought against the official of a foreign state and "there is no foreign sovereign act by a 'foreign state[.]'" Appellant's Br. at 2. In his view, *Samantar* established categorically that suits against such officials are not governed by the FSIA: "[t]he District Court adopted a concept advanced by [Maait] that the 'real party in interest' is Egypt (a concept that is not mentioned or defined in the FSIA or supported by the facts as they are in the record)[.]" *Id.* at 7. The District Court thus erred by allowing the Section 1441(d) removal, he submits. And even if Section 1441(d) did apply, the District Court also wrongly found "cause" to enlarge the time for removal under Section 1441(d). In sum, he argues that the District Court never had subject matter jurisdiction over the case and committed legal error by failing to grant Hussein's motion to remand to the New York state court.

For the reasons discussed below, we readily agree with the District Court and with Maait that *Samantar* endorsed the "real party in interest" concept and left ample room for its application in an appropriate case nominally brought against a foreign official in his official capacity, to avoid permitting plaintiffs to plead around the FSIA. *See Samantar*, 560 U.S. at 325. The question in what circumstances a sovereign is properly considered "the real party in interest" for FSIA purposes, and whether Egypt is the real party in interest with regard to Hussein's claim, requires a closer examination. Applied too broadly, the real-party-in-interest concept—useful as it is— could undercut *Samantar*'s core holding in cases against foreign officials. Section 1441(d)—and the discretion it affords district courts to enlarge the time limitations of Section 1446(b)—poses a similar challenge because it applies only to actions against a

16

foreign state as defined by the FSIA. 28 U.S.C. § 1441(d); *see, e.g., Refco, Inc. v. Galadari*, 755 F. Supp. 79, 81 (S.D.N.Y. 1991) ("If defendant is not, as plaintiff contends, a 'foreign state[,]' then pursuant to § 1446(b) defendants would have had only thirty days to file a notice of removal after receiving a copy of the initial pleading."). Nevertheless, we conclude that the same real-party-in-interest concept is appropriately applied at the threshold of removal as well.

As further explained below, then, we endorse application of the real-party-in-interest concept as consistent with *Samantar*, and we conclude that Egypt is indeed the real party in interest in Hussein's suit against Maait. Maait is accordingly entitled to invoke Egypt's sovereign immunity under the FSIA. We further conclude that the District Court did not abuse its discretion in ruling that the FSIA was sufficiently "implicated" to invoke Section 1441(d) and that Maait showed cause to enlarge the time for removal under Section 1441(d). Finally, we find that, on appeal, Hussein has waived any argument that an exception to FSIA immunity applies. Thus, the FSIA immunizes Maait from Hussein's suit. The District Court did not err by allowing removal and dismissing the action for want of jurisdiction.

## I. Egypt is the real party in interest in Hussein's suit

### A. Standard of review

We first address the threshold question of the standard of review to apply to the District Court's real-party-in-interest determination: Maait suggests that the District Court's conclusion that Egypt is the real party in interest is a factual finding subject to review only for clear error. Appellee's Br. at 14. Hussein does not engage directly with this proposition, but charges that the District Court "mistook material and relevant facts" in its ruling, implicitly appearing to agree with Maait that clear error review is appropriate. Appellant's Br. at 9.

We disagree that clear error alone governs our review: it is our practice to consider the District Court's factual findings that are predicate to a jurisdictional ruling under clear error review, but as to the jurisdictional ruling itself, which requires application of the law to the facts, we generally apply de novo review. *See Robinson v. Gov't of Malaysia*, 269 F.3d 133, 138 (2d Cir. 2001) (FSIA context); *see also Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293, 297 (2d Cir. 2009) (admiralty jurisdiction context). We see no reason to stray from that approach here. Especially since the "real-party-in-interest" component of our analysis is little developed in this area of the law, de novo review strikes us as best suited to examining the application of this concept to the facts of record here.

With regard to our clear error review of the facts relevant to our jurisdictional analysis: Hussein accuses the District Court and Maait of misconstruing relevant evidence,[10] but he does not identify any factual dispute that bears on the legal questions before us. We therefore proceed on an essentially uncontested factual canvas to consider de novo two legal questions: first, whether *Samantar* allowed a "real-party-in-interest" exception to its core holding, generally denying FSIA immunity to public officials of foreign sovereigns; and second, whether the District Court here erred in determining on the undisputed facts that Egypt was the real party in interest, triggering application of the FSIA to the suit. *Cf. Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 107 (2d Cir. 2016) ("Because the district court based its [FSIA commercial-activity exception] decision on undisputed facts drawn from

---

[10] For example, Hussein charges the district court erred factually in saying "that Egypt did a 'straightforward taking'" in 1997 of the SIMO shares, whereas the Decree in 2014 required the government to compensate SIMO's shareholders: "Egypt did not simply take them," he retorts. Appellant's Reply Br. at 5. But the District Court's statement did not preclude later compensation and, either way, the disagreement has no effect on the real-party-in-interest calculus.

Plaintiffs' complaint and [the defendant's] evidentiary submissions, our review is de novo."); *Virtual Countries, Inc. v. Republic of S. Afr.*, 300 F.3d 230, 235 (2d Cir. 2002) ("*De novo* review is appropriate even where, as here, the district court supplements the allegations in the complaint with 'undisputed facts from the record.'" (quoting *Robinson*, 269 F.3d at 138)).

**B.**    *Samantar*

The Supreme Court's holding in *Samantar* that the FSIA does not ordinarily govern foreign officials' claims for immunity shapes our real-party-in-interest analysis. Accordingly, we turn to it now. On this issue, our views are closely aligned with Maait's.

In *Samantar*, a group of Somali citizens brought suit in a United States district court against Mohamed Ali Samantar, who served as Somalia's First Vice President and Minister of Defense from 1980 through 1986, and as the country's Prime Minister from 1987 through 1990. *Samantar*, 560 U.S. at 308. The plaintiffs alleged that, during the 1980s, they or their family members were victims of torture and extrajudicial killings in Somalia, carried out by the then-governing military regime, the regime that installed and supported Samantar. *Id.* They sued him for damages "based on his alleged authorization of those acts." *Id.* At issue was whether, in a suit under the Alien Tort Act and the Torture Victims Protection Act for actions taken in violation also of international law, the FSIA nonetheless sheltered Samantar from a suit in the United States arising from actions by him taken while in office. *Id.*

The Court began its analysis by observing that "[t]he doctrine of foreign sovereign immunity developed as a matter of common law long before the FSIA was enacted in 1976." *Id.* at 311. It was "indisputabl[e]," the Court declared, that after its enactment in 1976, the FSIA "governs the determination of whether a foreign state is

19

entitled to sovereign immunity." *Id.* at 313. But in 2010, at the time of the Court's writing, it was still an open question whether the FSIA "also covers the immunity claims of foreign officials," or whether those claims would be covered by the preexisting common law of immunity. *Id.*

After examining the text and history of the FSIA and identifying its core purposes—for example, to achieve consistency of U.S. courts' treatment of foreign sovereigns and to regularize relations between the courts and the executive branch in that treatment—the Court concluded that an "individual sued for conduct undertaken in his official capacity" is neither a "foreign state" nor an "agency or instrumentality of a foreign state" within the meaning of the immunity-granting provisions of the Act. *See id.* at 314–19, 323 (discussing 28 U.S.C. § 1603(a)–(b)). The Court thus rejected the view of several circuits, including our own, that individual foreign officials were properly treated as "agencies or instrumentalities" of a foreign state under the FSIA and thus protected by the FSIA's immunity framework. *See id.* at 310; *see, e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d at 81. The FSIA does not generally govern the immunity claims of foreign officials, the court decided. *Samantar*, 560 U.S. at 313–15.

In articulating its decision, however, the Court acknowledged the possibility that, if applied too broadly, its decision could have the perverse effect of inviting plaintiffs to plead around the FSIA by suing and obtaining damages from government officials. Such a result, it said, would "in effect make the statute optional." *Id.* at 324 (quoting *Chuidian v. Philippine Nat. Bank*, 912 F.2d 1095, 1102 (9th Cir. 1990)). The Court predicted, however, that for several reasons this undesirable result would not occur. First, the Court's decision preserved preexisting common law immunities as to foreign government officials: "Even if a suit is not governed by the Act, it may still be barred by foreign sovereign immunity under the common law." *Id.* Second, "not every suit can successfully be pleaded against an individual official alone." *Id.* For example, a plaintiff

might name "only a foreign official" as a defendant, but "the foreign state itself, its political subdivision, or an agency or instrumentality [may at times be] a required party"—that is, one that under Federal Rule of Civil Procedure 19(a)(1)(B) must be joined as a party. *Id.* Where joinder to a suit against an official is required "and the entity [required to be joined] is immune from suit under the FSIA," then the district court "may have to dismiss the suit," it advised, "regardless of whether the official is immune or not under the common law." *Id.* at 324–25 (internal citations omitted).

Third, and critically for present purposes, the Court posited that "some actions against an official in his official capacity should be treated as actions against the foreign state itself, *as the state is the real party in interest*." *Id.* at 325 (emphasis added). In further explanation, it referred to its 1985 decision in *Kentucky v. Graham*, 473 U.S. 159, a section 1983 civil rights suit in which the Supreme Court observed that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity." *Id.* at 166 (citation omitted); *see also Samantar*, 560 U.S. at 325.

In *Samantar* itself, the presence of the state of Somalia in the suit was not required as either a necessary party (for Rule 19 joinder) or as the real party in interest, because the plaintiffs "sued [Samantar] in his *personal capacity* and [sought] damages from his *own pockets*." *Samantar*, 560 U.S. at 325 (emphases added). The Court thus held that the plaintiffs' suit against Samantar was "properly governed by the common law" of immunity—not by the FSIA. *Id.* Accordingly, the Court remanded for the district court to consider in the first instance whether Samantar may be entitled to that type of immunity. *Id.* at 325–26.

*Samantar* makes clear nevertheless that, in some suits against an individual official, "the state is the real party in interest." *Id.* at 325. These should be "treated as actions against the foreign state itself" and therefore as governed by the FSIA. *Id.*

21

Particularly where a plaintiff sues a foreign sovereign's officer in the individual's official capacity and seeks damages not from the official's "own pockets" but from the state's treasury, it is likely that the state is the real party in interest, the Court taught. *See id.* at 325–26.

C.    The real-party-in-interest exception generally

This case presents us with our first occasion to examine in detail and apply the real-party-in-interest exception to *Samantar*'s general rule that the FSIA does not govern foreign officials' immunity to suit. The Court did not provide guidance for applying the exception, but since *Samantar* was handed down, other courts to confront this question have inferred a series of factors useful for that task. We now proceed in a similar vein. Largely in line with the approaches adopted by those courts, we identify three key (but non-exclusive) factors to consider.

Preliminarily, we note that the phrase "real party in interest" is a term of art that has been used in diverse legal contexts. Black's defines "real party in interest" in the context of a plaintiff as: a "person entitled under the substantive law to enforce the right sued on and who generally, but not necessarily, benefits from the action's final outcome." *Party*, Black's Law Dictionary (12th ed. 2024) (sub-definition). Federal Rule of Civil Procedure 17(a) provides accordingly that "an action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a); *see* 6A C. A. Wright, A. R. Miller, M.K. Kane, Fed. Prac. & Proc. Civ. § 1543 (3d ed. 2024) ("[T]he action must be brought by the person who, according to the governing substantive law, is entitled to enforce the right.").

In a suit for damages against a government official in his official capacity, the government entity is generally understood to be the "real party in interest" because, in such suits, the individual official will not be responsible for paying any judgment:

22

instead, "a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Graham*, 473 U.S. at 166. Put differently, "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent[.]" *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). It follows that death or replacement of the official named in such an official-capacity suit "will result in automatic substitution of the official's successor in office." *Graham*, 473 U.S. at 166 n.11 (citing Fed. R. Civ. P. 25(d)(1); Fed. R. App. P. 43(c)(1)). The *Samantar* Court recognized as much when it pointed the reader to *Graham* in articulating a real-party-in-interest possibility. *See* 560 U.S. at 325.

In litigation against an officer of one of the United States, the state is generally treated as the real party in interest if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984) (internal quotation marks omitted); *see also Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945) ("[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants."). Here, we have an analogous task to determine whether, in a lawsuit brought against a foreign government official, the foreign sovereign should be treated as the real party in interest.

Courts charged with this task to date have identified three relevant factors, all of which we adopt. First, and most obviously, *Samantar* instructs that courts should consider the process by which the plaintiff sues the defendant, looking to whether the plaintiff states that he is suing the foreign official in his personal capacity or in his official capacity. *Samantar*, 560 U.S. at 325 (noting that the real-party-in-interest exception may apply to "actions against an official in his official capacity"). In some

cases, the plaintiff's complaint will say in the caption in what capacity the foreign official is sued; in others, not. In cases of doubt, we look to all of the complaint's language, the course of the proceedings more broadly, and the details of the claim and the remedy sought to determine the capacity in which the foreign official is sued.[11]

Second, courts look to the substance of the liability claim. A plaintiff might be adamant that he has sued an official in his personal capacity and might have framed the complaint accordingly, but the ultimate determination is not for the plaintiff to make. As observed in *Samantar*, the real-party-in-interest exception is designed to avoid "artful pleading" by plaintiffs that might make the FSIA's governmental immunity provisions "optional." *Id.* at 324. To prevent such a result, a court must determine whether the substance of the plaintiff's liability claims is better understood as a personal liability claim based on personal acts, or as an official-capacity suit in which the state is the real actor and accordingly the real party in interest.

For example, in *Odhiambo v. Republic of Kenya*, the U.S. District Court for the District of Columbia concluded from the complaint's allegations against Kenya and two individuals named in their official capacity that "[t]his is a breach of contract case and the only contract at issue is between [the plaintiff] and the Kenyan government." 930 F. Supp. 2d 17, 34 (D.D.C. 2013), *aff'd*, 764 F.3d 31 (D.C. Cir. 2014). On that basis, the court

---

[11] Some courts considering whether a state is the "real party in interest" have relied heavily on Section 1983 case law. *See, e.g.*, *Qandah v. Johor Corp.*, No. 20-1991, 2021 WL 5446767, at *6 (6th Cir. Nov. 22, 2021) (summary order) ("When the plaintiff's [Section 1983] complaint does not make clear whether a defendant is sued in an official or personal capacity, we make this determination by examining . . . the way defendants are named in the complaint, whether the complaint's language indicates an individual-capacity suit, and whether the complaint seeks damages in general or damages from each individual."); *cf. Shabazz v. Coughlin*, 852 F.2d 697, 700 (2d Cir. 1988) (relying on the form of relief sought and defenses invoked to analyze in what capacity Section 1983 claims were brought against defendants). The inquiry is no doubt similar, but different considerations than those posed in FSIA litigation may ultimately be at play in such suits and so we do not rely on them heavily here.

dismissed the complaint under the FSIA for want of jurisdiction. *Id.* at 35. And, on the other hand, in *Angellino v. Royal Family Al-Saud*, 688 F.3d 771, 772 (D.C. Cir. 2012), a panel majority of the D.C. Circuit considered an artist's contract-based claim against members of the Saudi royal family for commissioned artwork. It determined that the "[official] defendants were sued in their individual capacities" because the breach of contract claim "does not allege an act of state such that Angellino's action against the individual defendants 'should be treated as [an] action[] against the foreign state itself . . . .'" *Id*. at 775 n.6 (quoting *Samantar*, 560 U.S. at 325) (alterations in original).

In some cases, a plaintiff's allegations might sufficiently establish that the plaintiff is suing the defendant officials for official actions taken on behalf of the foreign state, making it readily apparent that the state is the real party in interest. *See, e.g.*, *Li v. Li*, No. 20-2008, 2023 WL 2784872, at *4 (D.D.C. Apr. 5, 2023) ("[E]ach official is discussed solely in his capacity as the representative of the government department they oversaw" and "the Amended Complaint's very first paragraph states that the case is about 'crimes by the totalitarian regime of the People's Republic of China (PRC) under the [reign] of Chinese Communist Party (CCP).'" (alterations in original)). In a brief non-precedential decision in our own Circuit, we affirmed a district court ruling that proceeded along those same lines. *Gomes v. ANGOP Angola Press Agency*, No. 11-CV-0580 DLI JO, 2012 WL 3637453, at *19 (E.D.N.Y. Aug. 22, 2012) ("Plaintiff makes no allegations against the Individual Defendants regarding actions taken by them outside of their respective roles in Angola's political structure. As such, the real parties in interest in this case are Angola and its political institutions[.]"), *aff'd sub nom. Gomes v. ANGOP*, 541 F. App'x 141 (2d Cir. 2013) (summary order).

Third, and most obviously, courts consider the relief sought by the plaintiff and the party targeted for the requested relief. As the Court explained in *Samantar*, a "personal capacity" suit seeking damages from the official's "own pockets" will be

governed by the common law of official immunity. 560 U.S. at 325. But an action seeking relief directly or unavoidably from the state—because of the nature of the liability, the type or magnitude of relief sought, or a combination of these factors—will be best understood as one against the state and therefore governed by the FSIA. *See, e.g.*, *Odhiambo*, 930 F. Supp. 2d at 35 ("[A]ny damages that [the plaintiff] recovers in this suit will be payable by the Kenyan government and not from the individual defendants' 'own pockets.'"); *Nnaka v. Fed. Republic of Nigeria*, 238 F. Supp. 3d 17, 31 (D.D.C. 2017) ("[E]ven if [the plaintiff] was to obtain his desired judgment . . . against [the defendant] in his official capacity, [he] would need to look to Nigeria in order to recover."), *aff'd*, 756 F. App'x 16 (D.C. Cir. 2019) (summary order); *Li*, 2023 WL 2784872, at *4 ("[T]here is no indication that Plaintiffs are seeking damages directly from the pockets of the individual Defendants."); *Rosasen v. Kingdom of Norway*, No. 21-cv-06811-JWH (SP), 2022 WL 409679, at *6 (C.D. Cal. Feb. 10, 2022) ("[I]t is likely that any potential damages would be paid by the government of Norway given the nature of plaintiff's allegations.").

In short, to determine the real party in interest in a suit against a foreign official, courts should consider at least the following: (1) the process used by the plaintiff to sue and serve the defendant official, including whether the plaintiff names the defendant in their official or personal capacity, and whether the complaint's language and the overall course of proceedings are more consistent with an official- or an individual-capacity suit; (2) the substance of the plaintiff's claims, in particular whether the claims center on official actions attributed to the government or on personal actions attributed to the named official(s); and (3) the nature of the relief sought, including the magnitude of any demanded money judgment, and the party from which the plaintiff explicitly or implicitly seeks the requested relief.

Other relevant factors may emerge over time. For current purposes, however, these suffice to guide our analysis.

### D.    The real-party-in-interest rule as applied here

Hussein sued Maait in his official capacity. Hussein attributes his alleged injuries—the monetary loss caused by the expropriation of his SIMO stock—to actions taken in the first instance by the Egyptian government. (That in these proceedings he has attempted to frame the wrong as Maait's *failure* as Minister of Finance to transfer to him the amount purportedly due from the country's treasury is of little import. *See* Section E below, discussing Hussein's *ultra vires* argument.) And, as reflected in the complaint and in other statements, he is unmistakably demanding compensation from Egypt, not from Maait personally. As Maait contends, and consistent with the District Court's conclusion, each of these factors supports the conclusion that Egypt is the real party in interest in Hussein's suit.

First, Hussein named Maait in Maait's official capacity as Egypt's Minister of Finance as a defendant in both Hussein's motion in state court and in his FSIA Notice of Suit. App'x at 19, 60.[12] The broader course of proceedings, too, confirms that Maait is sued officially, not personally. For example, Hussein declares that in advance of filing suit he tried to initiate an arbitration against Egypt before the International Centre for Dispute Resolution to resolve his claim, but did not succeed because "Egypt refused to

---

[12] Hussein also served the ESLA, and requested service under the FSIA's service provision. These actions provide additional support for the conclusion that Maait was sued in his official capacity. *Cf. Samantar*, 560 U.S. at 324 n.20 ("[A] plaintiff seeking to sue a foreign official will not be able to rely on the [FSIA's] service of process and jurisdictional provisions."); *Nasrany v. Gen. Consulate of Kuwait*, No. 24-CV-7163 (LJL), 2024 WL 5009789, at *6 (S.D.N.Y. Dec. 6, 2024) ("When individual officials of a foreign sovereign are sued for their own conduct—rather than as proxies for the conduct of their foreign government—those individuals must be served not according to the FSIA but instead in a manner consistent with the procedural rules of that jurisdiction and with applicable international treaties.").

consent to the arbitration." App'x at 42 ¶ 26. And by Hussein's own account, he "repeatedly" petitioned not only Maait, but also several other high-level officials in the Egyptian government (including the Minister of Public Sector, the Chairman of the Investment Authority, the Head of the Holding Company for Chemical Industries, and "other responsible government representatives"), to secure compensation for SIMO's former private shareholders, including himself. *Id.* at 41 ¶ 23. In other words, on several previous occasions Hussein sought the same relief as he seeks here but proceeded directly against the Egyptian government. Even if Hussein's state court motion had not designated Maait as defendant in his official capacity, Hussein's prior court and arbitration actions in court would fully support the inference that his is an official-capacity suit and that he seeks recovery against Egypt, not from Maait's personal coffers.

Second, the substance of Hussein's allegations underscores that Egypt is the real party in interest in his action. As described, Hussein seeks enforcement of two related government directives: Judgment 6193 and Decree 961. He alleges that these directives generally compelled the Minister of Finance to "compensate all shareholders" (including Hussein) for their expropriated SIMO shares. App'x at 41 ¶ 19. The substantive theory of Hussein's liability allegations leaves no doubt, however, that he seeks to have *whoever* is serving in that office simply facilitate his compensation from the public treasury. And Decree 961, on which Hussein relies so heavily, directs the "Minister of Finance"—not Maait in particular—to "provide all necessary financial credits related to the [SIMO] shareholders' rights[.]" *Id.* at 137. Were Maait to leave office,[13] Decree 961 would ostensibly require the new Minister of Finance, not Maait, to

_____

[13] It appears from unofficial online sources that Maait may no longer serve as Egypt's Minister of Finance, although no party has informed us of any such development. Absent formal documentation and notification of any such change, we will not automatically substitute

28

act to compensate Hussein and to do so using public funds. *Cf. Graham*, 473 U.S. at 166 n.11; *Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*, 663 F. Supp. 3d 11, 30 (D.D.C. 2023).

In fact, Hussein repeatedly acknowledges as much in his affirmation in the District Court when he complains, "To date, the Egyptian government has refused to compensate the shareholders of SIMO, including myself, for the effective nationalization of the Company as required by Egyptian Law[.]" App'x at 42 ¶ 27. There is no doubt that, at bottom, Hussein's dispute is with the Egyptian government, not with Maait personally: his claims "center on decisions attributed to 'the government' and various governmental agencies." *Rahim v. Sec'y, Establishment Div., Gov't of People's Republic of Bangladesh*, No. 11-cv-3368 KAM, 2011 WL 3625580, at *2 (E.D.N.Y. Aug. 12, 2011), *aff'd*, 481 F. App'x 18 (2d Cir. 2012) (summary order). That Maait may have had a ministerial role to play in effectuating the government's refusal or acquiescence to pay compensation does not alter that fact.

Third and finally: as he confirms in his own affirmation, Hussein claims a right to compensation from the Egyptian government, not from Maait's own resources. App'x at 39 ¶ 10 ("To date, I have not received any compensation from the Egyptian government for the taking of my interest in SIMO."); App'x at 40 ¶ 16 ("[T]he Egyptian government refused to honor the court's binding decision[.]"); *id.* at 42 ¶ 27 ("[T]he Egyptian government has refused to compensate the shareholders of SIMO."). Hussein attempts to side-step that core truth by stressing that Maait is the specific official who has a "duty imposed upon him by the Prime Minister's Decree" to pay compensation to SIMO's shareholders. Appellant's Reply Br. at 7. But Hussein's allegations give no reason to infer that he ultimately seeks funds from Maait personally; his target is the

---

Maait's successor as the defendant, especially in light of Hussein's argument that, despite how he captioned the case, his is a personal-capacity suit.

public fisc. *See Li*, 2023 WL 2784872, at *4 ("[T]here is no indication that Plaintiffs are seeking damages directly from the pockets of the individual Defendants.").

In sum, Hussein names Maait in his official capacity in his judicial proceedings; his substantive liability claims focus on Egypt's persistent failure to make him whole; and he seeks compensation from Egypt's public treasury. Egypt is therefore the real party in interest in these proceedings.

### E.     Hussein's ultra vires argument fails

Hussein urges still that Maait acted *ultra vires* when he failed to compensate Hussein as required by Judgment 6193 and Decree 961, and that in that failure, Maait cannot have acted as an agent of Egypt, and Egypt cannot be the real party in interest in this suit. In other words, since Maait failed to make payment as directed, he necessarily acted without legal authority, and his act cannot be attributed to the state for FSIA immunity purposes, but must be seen as Maait's, personally.[14]

This argument lands wide of the mark. Hussein's framing runs afoul of the text of Decree 961 and the facts as set out in Hussein's own affirmation: The Decree does not direct the Minister of Finance to pay Hussein a specific sum of money. It directs the Minister of Finance generally to "provide all necessary financial credits related to [SIMO] shareholders' rights[.]" App'x at 137. As the District Court observed, the Decree does not state what those credits are, how they are to be calculated, or to whom they are

---

[14] Appellant's Reply Br. at 4 (making the legal argument that "[n]ot every action by an official—including, especially, totally undocumented *inaction* by an official in defiance of foreign sovereign law—is immune or protected from suit under the FSIA"); *id.* at 7 ("[Hussein's] suit, boiled down to its essence, involves a claim against a foreign official who defied a foreign sovereign act—*i.e.*, the Prime Minister's Decree—and that foreign official's defiance, taken individually and without authority, cannot be the basis for jurisdiction under 28 U.S.C. § 1441(d).").

to be paid; it vaguely directs the (unspecified) "concerned agencies" to execute the general directive. *See Hussein*, 607 F. Supp. 3d at 377–78; *see also* App'x at 137.

True, Decree 961 recites that it requires that Judgment 6193 "be executed." App'x at 136. But Judgment 6193, too, awards no specific amount to Hussein or, for that matter, to anyone. Indeed, it is difficult to see how it could have made such an award to Hussein: Hussein was a named *defendant* in that case and, from what we can see, he lodged no counter- or cross-claim.

And even if Hussein's reading of Decree 961 is somehow valid under Egyptian law, and the "concerned agencies" have failed to faithfully execute the Decree, that failure can only be understood to reflect the reality that the Egyptian government—for its own reasons—chose not to provide Hussein and (presumably) others with the "necessary financial credits." App'x at 137. As mentioned, Hussein affirms that he repeatedly petitioned several different Egyptian governmental bodies and officials in various fora for compensation and was rebuffed by all of them. Only after those efforts failed did he cross the ocean and try to proceed against Maait on Judgment 6193 and Decree 961 in New York. This is not a case, therefore, where an official went rogue, acted patently beyond his legal authority, or disregarded explicit governmental directives; rather, Hussein's suit challenges the manner in which Maait generally exercised his official authority as Egypt's Minister of Finance. As Maait points out, this is not enough to pull him out from under the sovereign's protections under the FSIA.

Finally, even assuming that Maait personally failed to comply with Judgment 6193 and Decree 961, Egypt would remain the real party in interest in this case. It is true that in the domestic, federal, sovereign immunity context, courts have recognized an *ultra vires* exception to the general rule that "sovereign immunity protects . . . officers when [they] act in their official capacities." *Dotson v. Griesa*, 398 F.3d 156, 177 (2d Cir. 2005) (citing *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994)). This exception originated in the

Supreme Court's 1949 decision in *Larson v. Domestic & Foreign Commerce Corp.*, in which it held that federal sovereign immunity barred a breach of contract suit brought against the Administrator of the War Assets Administration seeking to enjoin the shipment of coal to parties other than the plaintiff. 337 U.S. 682, 684–85, 689 (1949). The Court recognized, however, that federal sovereign immunity would *not* bar suits for injunctive relief against government officials where the officials' challenged actions are patently unconstitutional or lay plainly beyond the officials' statutory authority, i.e., *ultra vires*. *See id.* at 689–91.

This framework, however, has no meaningful application here: the *Larson* exception shelters only "suits for specific relief against officers of the sovereign[.]" *See id.* at 689; *see also Dugan v. Rank*, 372 U.S. 609, 622 (1963) (in cases of *ultra vires* or unconstitutional actions "the officer's action can be made the basis of a suit for specific relief against the officer[.]" (internal quotation marks omitted)). In other words, *Larson*'s *ultra vires* exception applies only to requests for injunctive relief, and not to official-capacity suits seeking money damages from the public fisc such as is framed in the New York action. *See Clark v. Libr. of Cong.*, 750 F.2d 89, 104 (D.C. Cir. 1984) (*Larson*'s "two exceptions are only applicable to suits for specific, non-monetary relief."); *see also E. V. v. Robinson*, 906 F.3d 1082, 1095 (9th Cir. 2018) ("[T]he *Larson* framework does not apply in suits for damages[.]"). Suits for damages to be paid from the public fisc are quintessentially suits that will "disturb the sovereign's property"; they therefore implicate sovereign immunity. *Larson*, 337 U.S. at 687.

In this case, as we have explained, Hussein seeks recognition and enforcement of what he characterizes as a foreign country judgment granting him "recovery of a sum of

32

money[.]" App'x at 31 (quoting N.Y. CPLR 5302).[15] Hussein makes no allegation that Maait personally possesses that sum certain; and if Maait were replaced, then Hussein presumably would assert that the new Minister of Finance bears the same duty with which he now charges Maait: to facilitate the government's payment to him of the compensation due. Hussein did not seek a New York court order directing Maait as Egypt's Minister of Finance to transfer funds; his suit in essence seeks monetary relief against the sovereign, not "specific relief against [an] officer[] of the sovereign[.]" *Larson*, 337 U.S. at 688–89. He pushes back on this conclusion, claiming that "[r]egardless of who must ultimately compensate [Hussein] or whether Dr. Maait is sued in his individual or official capacity, [Hussein's] claim is not against Egypt. [Hussein's] claim is against Dr. Maait who refused to abide by Egypt's official Decree. Dr. Maait does not qualify as a 'foreign state' under 29 U.S.C. § 1441 or § 1603(a) of the FSIA." Appellant's Reply Br. at 4–5.

But even if—as Hussein alleges—Maait is solely responsible for Egypt's failure to comply with Decree 961, this alone would not transform Hussein's suit into one in which Maait is the real party in interest.[16] Whether a foreign official is sued for

---

[15] Maait does not argue on appeal that the "Egyptian Judgment" fails to satisfy the definition of a "foreign country judgment" under New York law, even though it specifies no sum due, does not name the persons entitled to any sum, and was not in its entirety issued by a court. *See* N.Y. CPLR 5301, 5302(a), 5303(a). We take no position on whether it constitutes a "foreign country judgment" under New York law.

[16] Each of the cases that Hussein cites for the proposition that the FSIA does not apply to Maait's "*ultra vires*" refusal to carry out Judgment 6193 and Decree 961 is inapposite because it involves the official's alleged acts of torture. *See* Appellant's Br. at 13–14. Such acts fall decidedly outside the scope of any official's authority under international law. *See In re Estate of Ferdinand Marcos, Hum. Rts. Litig.*, 25 F.3d 1467, 1470 (9th Cir. 1994) (rejecting the "argument that FSIA immunizes alleged acts of torture and execution by a foreign official"); *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1198 (S.D.N.Y. 1996) ("[The defendant] does not argue that such acts are not prohibited by the laws of Ghana; nor could he. . . . [N]o government asserts a right to torture its citizens . . . ."); *Xuncax v. Gramajo*, 886 F. Supp. 162, 169, 176 (D. Mass. 1995) (finding that acts of "gruesome

unauthorized acts may in some cases, we suppose, bear on the real-party-in-interest analysis. And a determination whether the acts were within the scope of the defendant official's authority may clarify both the nature of the plaintiff's claims and the relationship of the defendant official's acts to the relevant sovereign. But even if, as alleged, Maait has failed to make a payment directed by Judgment 6193 and Decree 961, Hussein's suit names Maait in his official capacity and alleges a repeated failure over time of the Egyptian government (not Maait) to compensate him for the government's (not Maait's) taking. Hussein does not deny seeking compensation ultimately from the public treasury. Under these circumstances, as we have explained, Egypt is the real party in interest, *ultra vires* act or not.

In sum, Egypt is the real party in interest in Hussein's suit seeking compensation for his allegedly expropriated SIMO shares. In defending the suit, Maait is entitled to invoke Egypt's sovereign immunity under the FSIA, as well as the FSIA's other procedural protections.

## II. The District Court did not abuse its discretion in extending the period for removal pursuant to 28 U.S.C. § 1441(d)

Because Egypt was the real party in interest, Maait stood in the state's shoes, and he was entitled to remove this action to federal court under 28 U.S.C. § 1441(d), which,

---

violence," *id.* at 169, committed by military personnel under the defendant's direct command "exceed anything that might be considered to have been lawfully within the scope of [the defendant's] official authority," *id.* at 176). The decisions he cites also are of little value here because they predate *Samantar*: each decision analyzed whether the official was a "foreign state" within the meaning of the FSIA based on the then-current rule that foreign sovereign immunity extends to an individual official "for acts committed in his official capacity" but not to "an official who acts beyond the scope of his authority." *Chuidian*, 912 F.2d at 1103, 1106; *see In re Estate of Ferdinand Marcos*, 25 F.3d at 1470; *Cabiri*, 921 F. Supp. at 1197; *Xuncax*, 886 F. Supp. at 175. As reviewed above, *Samantar* explicitly rejected that mode of analysis. *See Samantar*, 560 U.S. at 322 n.17.

as noted above, governs actions brought in state court "against a foreign state as defined in Section 1603(a)[.]" Maait failed to remove the action within 30 days of service, however, as generally required by Section 1446(b). We now turn to the question whether, as Hussein briefly contends, the District Court committed reversible error in concluding that Maait showed "cause" sufficient to permit enlargement of the time to remove set by Section 1446(b). *See* 28 U.S.C. § 1441(d).[17]

## A.     Standard of Review

Section 1441(d) authorizes the removal of civil actions brought "against a foreign state." 28 U.S.C. § 1441(d). As to the timing of such a removal, it provides that "[w]here removal is based upon this subsection, the time limitations of section 1446(b) . . . may be enlarged at any time for cause shown." *Id.* Section 1446(b)(1) sets out the general rule that a notice of removal "shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading."

Our Court has not yet established a standard for review of a district court's finding of "cause" to enlarge the time for removal under Section 1441(d). For the reasons set forth below, we decide (as have our sister Circuits) that such a finding is

---

[17] Logic suggests that, before evaluating whether "cause" was shown under Section 1441(d), the District Court had first to determine whether the state was the real party in interest so that Maait could rely on Section 1441(d) at all. Here, though, the District Court first found that sovereignty was "implicated"; then ruled, as practicality required, on the real-party-in-interest question; and finally, found "cause." If before entry of final judgment, however, it had determined that the state, though "implicated," was *not* the real party in interest, it could have found the notice of removal not correctly filed under Section 1441(d), and could then have remanded to the state court. *See Vossbrinck v. Accredited Home Lenders, Inc.*, 773 F.3d 423, 427 (2d Cir. 2014) ("When a case has been removed from state court to federal court, '[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.'" (quoting 28 U.S.C. § 1447(c)). Here, such a remand was not necessary.

subject to review for abuse of discretion. Then, we determine that the District Court here did not abuse its discretion in enlarging the time for Maait to notice removal.

The general analysis is straightforward. "[T]he language of [Section 1441(d)] is permissive, rather than mandatory: a district court 'may' enlarge the removal period if cause is shown, but is not required to do so." *Big Sky Network Canada, Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1186 (10th Cir. 2008) (Gorsuch, Circuit Judge) (quoting 28 U.S.C. § 1441(d)). "The word 'may,' when used in a statute, usually implies some degree of discretion." *United States v. Rodgers*, 461 U.S. 677, 706 (1983). And "[w]hen a district court is vested with discretion as to a certain matter, it is not required by law to make a *particular* decision. Rather, the district court is empowered to make a decision—of *its* choosing—that falls within a range of permissible decisions." *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 168–69 (2d Cir. 2001).

This Court applies an abuse of discretion standard on review of district court decisions concerning other extensions of deadlines for "cause" or "good cause" shown. *See, e.g., Alexander v. Saul*, 5 F.4th 139, 142, 146–48 (2d Cir. 2021) (reviewing for abuse of discretion decision that found neither "good cause" nor "excusable neglect" under Fed. R. App. P. 4(a)(5) existed to extend the time for filing a notice of appeal); *Meilleur v. Strong*, 682 F.3d 56, 61 (2d Cir. 2012) (reviewing for abuse of discretion Fed. R. Civ. P. 4(m) dismissal for untimely service of process after determination that no "good cause" shown). That Section 1441(d) allows removals "at any time" for "cause"—not even "good cause"—further reflects a Congressional intention that district courts exercise broad discretion in considering requests to enlarge the Section 1446 removal period. We therefore review for abuse of discretion the District Court's decision to allow Maait's late removal filing.

The meaning of "abuse of discretion" is well established in our Circuit: "A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision

rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Zervos*, 252 F.3d at 169 (footnotes omitted).

**B.** <u>The District Court did not abuse its discretion in enlarging the period for Maait's removal notice</u>

Applying that standard here, we identify no abuse of discretion.

In evaluating whether a party has established "cause" warranting enlargement of time under Section 1441(d), district courts in this Circuit have typically considered the following factors: "the purpose of the removal statute, the extent of prior activity in the state system, the prejudice to both parties, the effect on the substantive rights of the parties and any intervening equities." *Refco*, 755 F. Supp. at 83; *see also James v. Gov't of St. Lucia*, No. 08-cv-67, 2008 WL 4410959, at *2 (E.D.N.Y. Sept. 29, 2008) (same); *Steadman v. Sinclair*, No. 96-cv-599, 1996 WL 257664, at *3 (S.D.N.Y. May 16, 1996) (Chin, J.) (same). Here, these factors uniformly favored the limited extension that the District Court decided was warranted.

Section 1441(d) reflects a desire "to allow for a uniform body of law concerning foreign states to emerge in the federal courts." *Refco*, 755 F. Supp. at 83. Because Egypt is the real party in interest, a denial of removal and consequent state court adjudication of Hussein's claims would undermine Congress's choice to "channel cases against foreign sovereigns away from the state courts and into federal courts[.]" *Verlinden*, 461 U.S. at 497; *see also Proyecfin de Venezuela, S.A. v. Banco Indus. de Venezuela, S.A.*, 760 F.2d 390, 396–97 (2d Cir. 1985).

This is one factor to consider. But a sovereign need not always be permitted leave to file a late notice of removal: in Section 1441(d), Congress did not adopt a removal rule that made its desire for federal adjudication and uniformity of law dispositive of

every removal motion filed by a foreign state. It instead required "cause," and it committed the decision to the district court's discretion. As then-Judge Gorsuch wrote about Section 1441(d)'s provisions, "[I]f status as a foreign sovereign were enough to justify enlarging the removal period, literally every member of the group to whom the statute applies would qualify for enlargement simply by virtue of its membership. Such a reading would render meaningless the limitation that Congress placed on the district court's discretion—namely, that enlargement could only be for 'cause'[.]" *Big Sky*, 533 F.3d at 1186–87.

Turning, then, to other relevant factors, we observe that Hussein has failed entirely to show that he was prejudiced by the brief extension. During the 23-day delay, no activity at all occurred in the state court action—not even the filing of a return of service. And Hussein does no more than assert conclusorily that he was "deprived of an ability to defend his interests against removal[.]" Appellant's Br. at 8. That is incorrect: In his motion to remand and in presenting oral argument on the requested remand to the District Court, Hussein had ample opportunity to advance arguments in opposition to removal and demonstrate prejudice. Yet he was silent.

In contrast, Maait's counsel averred that she faced legitimate obstacles in finalizing the international representation and obtaining needed translations and governmental approvals before she could file the removal petition. The District Court had no evidence before it to counter those persuasive assertions or to suggest they were made in bad faith. And, as the District Court noted, notwithstanding the brief delay in noticing the removal, the case was likely to proceed in federal court "much more swiftly than it would in state court[.]" App'x at 228–29.

Hussein contends nonetheless that cause was not shown because Maait hired counsel only six days before the end of the ordinary 30-day removal period. Further,

Maait's counsel, he urges, should have been able to be more timely in filing her removal notice in light of her prior experience appearing in federal courts on Egypt's behalf.

We are not persuaded. The District Court could perhaps have relied on such evidence to justify a different decision. But nothing required it to do so. In sum, "the relatively short extension sought, the lack of prejudice to [Hussein] or the state courts of [New York], and the absence of any evidence of bad faith . . . collectively indicate that the district court's discretion was at its broadest." *Big Sky*, 533 F.3d at 1188. Its decision fell easily within "the range of permissible decisions." *Zervos*, 252 F.3d at 169. Hussein's challenge to the District Court's exercise of discretion fails.

## III.     Hussein has waived any argument that an exception to FSIA immunity applies

As a proxy for the real party in interest in the suit, Egypt, Maait is entitled to immunity unless one of the FSIA's statutory exceptions applies. *See* 28 U.S.C. §§ 1603(a), 1604; *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007). If Hussein fails to establish the applicability of an exception, the case must be dismissed for want of jurisdiction.

In the District Court, Hussein argued in passing that the "commercial activity" exception to foreign sovereign immunity—the most obviously possibly applicable exception—applies and defeats Maait's immunity claim.[18] But, as noted above, Hussein does not renew that argument, unsuccessful below, on appeal. Nor does Hussein

---

[18] The "commercial activity" exception to sovereign immunity allows U.S. courts to exercise jurisdiction over a foreign sovereign where "the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]" 28 U.S.C. § 1605(a)(2). The District Court persuasively reasoned that no part of this exception applied to Hussein's claim. 607 F. Supp. 3d at 379–390.

contend in his opening brief on appeal that any other statutory exception to FSIA immunity applies.

"[A]rguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief." *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005). Hussein has thus abandoned the argument that the commercial activity exception applies and has waived any argument that any other exception to statutory immunity applies.

We therefore conclude that the FSIA deprived the District Court of jurisdiction over this suit.

## CONCLUSION

The government of Egypt is the real party in interest in Hussein's suit against Maait; the FSIA governs the suit; and no exception to FSIA immunity has been shown to apply. The District Court correctly determined that Section 1441(d) applied to Maait's tardy removal and did not abuse its discretion in enlarging the time for removal. The judgment of the District Court dismissing the suit for want of jurisdiction is **AFFIRMED**.